# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 03-606

**STATE OF LOUISIANA**

**VERSUS**

**JOHN R. CHESSON**

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 7919-97
HONORABLE DAVID KENT SAVOIE, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

**MARC T. AMY**
**JUDGE**

\*\*\*\*\*\*\*\*\*\*

Court composed of John D. Saunders, Marc T. Amy, and Glenn B. Gremillion, Judges.

**AFFIRMED; REMANDED WITH INSTRUCTIONS.**

**Robert Richard Bryant, Jr.**
**District Attorney**
**14ᵗʰ Judicial District Court**
**Post Office Box 3206**
**Lake Charles, LA 70602**
**(337) 437-3400**
**COUNSEL FOR APPELLEE:**
    **State of Louisiana**

**Edward Kelly Bauman**
**Louisiana Appellate Project**
**Post Office Box 1641**
**Lake Charles, LA 70602-1641**
**(337) 491-0570**
**COUNSEL FOR DEFENDANT/APPELLANT:**
    **John R. Chesson**

**John R. Chesson**
**Louisiana State Penitentiary**
**Ash Unit - 2**
**Angola, LA 70712**

AMY, Judge.

The defendant was convicted of second degree murder in the death of his estranged wife's former mother-in-law. The defendant appeals his conviction. He assigns a number of errors, including sufficiency of the evidence and the denial of a motion to suppress. For the following reasons, we affirm and remand with instructions.

## Factual and Procedural Background

This matter involves the death of Lucindy Thibodeaux on February 17, 1997. Prior to this date, the defendant, John Chesson, arrived in the Vinton, Louisiana area, after his wife left their residence. According to the State, the defendant's wife left the defendant a note indicating her intention to leave the marriage. The defendant then moved to southwest Louisiana, temporarily residing with his daughter, Ruby, and her husband, Gary. Mr. Chesson's other daughter, Francis, was also residing in the home at the time.

According to the State, the defendant awoke on the morning of February 17th and wrote a letter to his estranged wife. The defendant's daughters both testified that the defendant informed them that he had dreamed that the Devil told him to kill someone. He then left the house. Due to the statement, the daughters contacted a priest to bless the house.

At approximately 9:00 a.m., Mrs. Lucindy Thibodeaux contacted her daughter, Theresa Moller, and informed her that the defendant had been to her home, inquiring as to the whereabouts of his wife. The record indicates that Mrs. Thibodeaux was the former mother-in-law of the defendant's wife and the grandmother of his wife's daughter. According to Theresa, Mrs. Thibodeaux reported that she informed the defendant that she did not know her whereabouts and asked him to leave. She also reported to Theresa that her husband was not at home. Theresa explained that her

mother was upset and scared. Furthermore, Mrs. Thibodeaux's son, James Thibodeaux, testified that his mother telephoned him, also around 9:00 a.m., and reported that the defendant had been to the house and was looking for his wife. According to James, his mother thought the defendant left, but she was frightened. James then called the Calcasieu Sheriff's Department, informing them of the visit and asking them to send someone to Mrs. Thibodeaux's home. James then left for the home himself.

Sonny Granger, a patrolman with the Calcasieu Sheriff's Department, responded to the call, traveling to the Carlyss, Louisiana home. When he arrived, he found Mrs. Thibodeaux's husband sitting outside the front door. Mr. Thibodeaux was shaking and pointed into the house. Inside, Patrolman Granger found Mrs. Thibodeaux, lying in a pool of blood. The record indicates that Mrs. Thibodeaux had suffered, among other injuries, an eight and one-half inch cut to the throat.

While the area was cordoned off for investigation, a passerby, Daniel Oakley, stopped to inform authorities that he had seen a man in a truck in the driveway earlier in the morning. He testified that he had seen the man, who was wearing a cowboy hat, exit the truck, approach the house, then turn around abruptly to return to the truck. According to Mr. Oakley, the man averted his face.

Based on the information from James Thibodeaux and that from Mr. Oakley, authorities located John Chesson, questioning him. He initially denied having been at Mrs. Thibodeaux's house. Shortly, thereafter, however, he admitted having been at the house and explained that he felt he had hurt Mrs. Thibodeaux, but did not think she had been hurt that badly. The defendant stated that Mrs. Thibodeaux approached him with a knife and that he grabbed her hand, pushing it back toward her. Following two taped statements, the defendant was arrested.

2

In May 1997, the defendant was charged with first degree murder. In January 2000, the bill was amended to reflect a charge of second degree murder. Following a jury trial in October 2002, the defendant was found guilty as charged. He was subsequently sentenced to life in prison, without the benefit of parole, probation, or suspension of sentence.

The defendant appeals. Defense counsel filed a brief, asserting that a Motion to Suppress Confession and Inculpatory Statements was improperly denied and also that there was insufficient evidence to find the defendant guilty of second degree murder.

The defendant also filed a pro se brief, arguing: 1) His arrest was without probable cause, requiring the suppression of his statements to police; 2) His statements were obtained through improper influence and false information; 3) The record is incomplete due to the failure to transcribe two bench conferences and the lack of transcript related to a Motion to Suppress Identification; 4) The Sanity Commission erred in failing to consider his state of mind at the time of the offense; 5) The trial court erred by permitting the introduction of irrelevant evidence and his trial counsel rendered ineffective assistance in failing to object to the introduction; 6) He was denied due process due to the State's failure to preserve exculpatory evidence; 7) The trial court erred in permitting the introduction of hearsay testimony; 8) He was denied his Fifth Amendment rights as authorities continued to question him after he stated that he no longer wanted to speak with them; 9) He was denied the right to be present at a hearing on a motion to suppress identification; 10) The trial court erroneously permitted the State to introduce unreliable evidence, depriving him of due process and a fair trial; 11) He was not permitted to fully cross-examine a witness; 12) The trial court erroneously permitted the introduction of unduly

prejudicial photographs and his counsel was ineffective due to their failure to object to the introduction; 13) His counsel was ineffective in failing to request a "great caution" jury instruction; 14-15) The indictment was defective due to racial discrimination in the selection of the foreperson of the grand jury and his counsel was ineffective for failing to file a motion to quash in this regard; and 16) The State withheld exculpatory evidence regarding the reliability of a State witness.

## Discussion

*Errors Patent*

Pursuant to La.Code Crim.P. art. 920, we have reviewed the record for errors patent on the face of the record. Our review reveals one such error. The defendant was not informed of the two-year time limit for filing post-conviction relief, a requirement of La.Code Crim.P. art. 930.8. Accordingly, we direct the trial court to inform the defendant of this time period within ten days of the rendition of this opinion. We further direct the trial court to file written proof into the record that the defendant received notice. *See State v. Charles*, 02-443 (La.App. 3 Cir. 10/2/02), 827 So.2d 553, *writ denied*, 02-2707 (La. 3/28/03), 840 So.2d 569.

*Sufficiency of the Evidence*

Defense counsel questions whether the State's evidence was sufficient to support the second-degree murder conviction. Counsel contends that, even with the defendant's taped statements to police, the evidence was insufficient to support a conviction other than manslaughter. In particular, the counsel contends that no evidence indicates that the defendant had the specific intent to kill Mrs. Thibodeaux. Instead, counsel argues, evidence indicates that the defendant was distraught due to the breakup of his marriage, was on medication, and acted in "sudden passion to save his marriage."

4

Second degree murder is defined at La.R.S. 14:30.1, which provides, in part:

A.    Second degree murder is the killing of a human being:

(1)    When the offender has a specific intent to kill or to inflict great bodily harm[.]

With regard to manslaughter, La.R.S. 14:31(A)(1) provides:

A.    Manslaughter is:

(1)    A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed by sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection.    Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled, or that an average person's blood would have cooled, at the time the offense was committed[.]

In *State v. Deal*, 00-0434, p. 5 (La. 11/28/01), 802 So.2d 1254, 1260, *cert. denied*, ___ U.S. ___, 123 S.Ct. 124 (2002), the Louisiana Supreme Court explained that "[t]he elements of 'sudden passion' and 'heat of blood' are mitigatory factors in the nature of a defense, and when such factors are established by a preponderance of the evidence, a verdict for murder is inappropriate." Furthermore, the supreme court stated that issues of provocation and time for cooling are left for the jury to consider "under the standard of the average or ordinary person, one with ordinary self control." *Id.*

In considering questions of sufficiency of the evidence, a reviewing court must consider the evidence presented in the light most favorable to the prosecution and consider whether a rational trier of fact could have concluded that the essential elements of the offense were proven beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781 (1979). The reviewing court defers to rational credibility and evidentiary determinations of the trier of fact. *State v. Marcantel*, 00-1629 (La. 4/3/02), 815 So.2d 50.

5

Although defense counsel argues that the defendant's circumstances demonstrate that he should have been convicted, at most, of manslaughter, our review of the record indicates that the record supports the defendant's conviction. Although the defendant may have been distraught due to his wife's having left the marriage and because he was on medication, these factors were insufficient to require the jury to have found that he was acting in sudden passion. Furthermore, although the defendant explained in his statements to the authorities that Mrs. Thibodeaux lunged at him with a knife, the jury was certainly not required to find merit in this assertion. Instead, the State presented evidence that Mrs. Thibodeaux, a 74 year-old woman with purportedly limited mobility, was home alone when attacked by the defendant. The coroner explained that the nature of the wounds to Mrs. Thibodeaux's neck was consistent with her having been kneeling with her head thrown or pulled back at time of the infliction of the wound. According to the coroner, the wounds were not consistent with the defendant's account of Mrs. Thibodeaux approaching him with a knife and him forcing her hand and the knife into her neck. This evidence, viewed in the light most favorable to the prosecution, does not require a finding of manslaughter, but, instead, supports a finding of specific intent to kill.

*Motion to Suppress*

Defense counsel asserts that the trial court erred in denying a motion to suppress videotaped admissions made to authorities. Counsel argues that, at the time of the statements, the defendant was under the influence of heart medication and an anti-depressant, prohibiting him from consenting to the questioning. Defense counsel also argues that questioning was impermissibly continued after the requested assistance of counsel. In his pro se brief, the defendant makes a similar claim regarding the suppression of the statement due to his desire for assistance of counsel.

6

In considering the admissibility of a statement, it is well settled that the State must bear the burden of demonstrating a defendant's knowing and intelligent waiver of his or her privilege against self-incrimination and the right to counsel. *State v. Vigne*, 01-2940 (La. 6/21/02), 820 So.2d 533, *quoting*, *Tague v. Louisiana*, 444 U.S. 469, 100 S.Ct. 652 (1980). Furthermore, La.R.S. 15:451 specifically states that before a confession can be introduced, "it must be affirmatively shown that it was free and voluntary, and not made under the influence of fear, duress, intimidation, menaces, threats, inducements or promises." A trial court's determination regarding the admissibility of a statement is to be given great weight and will not be disturbed by a reviewing court unless it is clearly unsupported by the evidence. *Vigne*, 820 So.2d 533.

Defense counsel alleges that the State failed to meet its burden of a knowing and intelligent waiver due to the condition of the defendant's health at the time of the statement, in particular what was argued to be intoxication from heart medication. In *State v. Simmons,* 443 So.2d 512, 515 (La.1983), the supreme court explained that "[i]ntoxication will render a confession inadmissible when the intoxication renders the defendant incapable of understanding his right to remain silent." The trial court found this complaint to be without merit.

At the motion to suppress hearing, three of the investigative officers explained that the defendant told them of his taking of nitroglycerin due to heart trouble. This information is reflected on the videotaped statement. The officers also testified, however, that the defendant did not appear to be intoxicated, nor did he appear to have difficulty in comprehending the situation. Each of the officers was familiar with nitroglycerin and its effects. They explained that the defendant appeared to understand his rights and was cooperative.

7

The defense brief indicates that the defendant had not only taken nitroglycerin, but anti-depression and blood pressure medications as well. Although a supplemental police report indicates that the defendant told officers that he was taking antidepressant medication, the officers testified that they did not recall being informed as such. While the supplemental police report is contained in the record, it was not introduced at the suppression hearing.

The trial court heard the testimony offered at the hearing and viewed the tape before denying the motion to suppress. Our review of both the record and the videotaped statement reveals support for the trial court's determination. In addition to the officer's statement and signed waiver forms included in the record, the videotaped statement indicates that the defendant was informed of his rights, appeared to understand the rights, and did not appear to be intoxicated, certainly not to the point of failing to understand his right to remain silent.

Both defense counsel and the defendant, through his pro se brief, assert that the defendant asserted his right to counsel and that the request was not honored by the officers, with statements taken afterward. The statement complained of occurred during the transport of the defendant from a substation in Vinton to the Calcasieu Parish Sheriff's Office. The following colloquy between Deputy Leroy Landry and the assistant district attorney describes the statement:

> Q    So, from Vinton to the task force office, the transport was accompanied by you; is that correct?
>
> A    Myself and Deputy Arron Mesh.
>
> Q    Was Mr. Chesson under arrest at that time?
>
> A    No, sir, I don't think he was under arrest at that time.
>
> Q    Did you place him under arrest?
>
> A    No, sir, I did not.

8

Q    When he went from Vinton to the task force office, was he in handcuffs?

A    Yes, sir.

Q    Now, at that point in time, did anything occur during the transport? Did you question Mr. Chesson during the time that you and Deputy Mesh drove him from Vinton to the task force offices?

A    No, sir. The only comment made, Mr. Chesson advised us that he might - - he felt like he should talk to an attorney, but I had no comment on that.

Q    And, if you would, can you remember his exact words?

A    The best of my recollection, Mr. Chesson stated to me and Mr. Mesh, "I think I might should talk to an attorney."

Q    "I think I might should talk to an attorney"?

A    Yes, sir, in - - I don't know the exact words, but reference to, "I should maybe have an attorney."

Q    Now, had you said anything to him to provoke that statement?

A    No, sir.

Q    Had Deputy Mesh?

A    No, sir, not to my recollection. No conversation was made in reference to anything to do with this case.

Q    And once the statement was made, did you or Deputy Mesh respond to it in any way, shape, or form?

A    No, sir.

Jurisprudence regarding the right to counsel in custodial situtations was reviewed by the Louisiana Supreme Court in *State v. Payne*, 01-3196 (La. 12/4/02), 833 So.2d 927. The court observed:

> When an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights. *Edwards* [*v. Arizona*, 451 U.S. 477, 484, 101 S.Ct. 1880, 1884-1885 (1981)]. Once an accused has expressed his desire to deal with the

police only through counsel, he is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges or conversations with the police. *Edwards*, 451 U.S. at 484-485, 101 S.Ct. at 1885. It is inconsistent with *Miranda* and its progeny for the authorities, at their insistence, to **reinterrogate** an accused in custody if he has **clearly** asserted his right to counsel. *Edwards*, 451 U.S. at 485, 101 S.Ct. at 1885 (emphasis added). . . .

. . . .

The applicability of the "'rigid'" phophylactic rule" of *Edwards* requires courts to "determine whether the accused **actually invoked** his right to counsel." *Davis v. United States*, 512 U.S. [452, 458, 114 S.Ct. 2350, 2355 (1994)] (emphasis in original)(citations omitted). To avoid difficulties of proof and to provide guidance to officers conducting interrogations, this is an objective inquiry. *Davis*, 512 U.S. at 458-459, 114 S.Ct. at 2355. Invocation of the *Miranda* right to counsel, "requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney." *Davis*, 512 U.S. at 459, 114 S.Ct. at 2355 (citation omitted). If a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable police officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, the cessation of questioning is not required. *Id.* (emphasis in original). The suspect must articulate his desire to have counsel present with sufficient clarity that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney. *Id.*

*Id.* at 935.

We find no error in the determination to deny the motion to suppress. The defendant's statement regarding his "thinking" that he possibly "should" speak with an attorney is not the type of unequivocal and unambiguous statement described above. *See Davis*, 512 U.S. 452, 114 S.Ct. 2350 (wherein the United States Supreme Court found the statement "Maybe I should talk to a lawyer" not to be an unequivocal invocation of the right to counsel).

This argument lacks merit.

10

*Probable Cause for Arrest*

In his first pro se assignment of error, the defendant not only asserts that his right to counsel was violated, which was addressed above, but contends that his arrest was without probable cause. He contends that when Deputy Leroy Landry first came into contact with him, blocking him in his driveway, he was not free to leave and was, thus, under arrest. He contends that, at this time, there was insufficient evidence to constitute probable cause for the arrest. Furthermore, he contends that an affidavit completed in support of a search warrant was based on false allegations.

We note that the specific nature of the defendant's arguments in this assignment was not advanced below. However, the defendant's first argument regarding detention without probable cause is one related to the voluntariness of his statements. This issue was considered by the trial court and, as we found above, is supported by the record. The remaining issue, that regarding the authenticity of the statements in the affidavit was not raised below and, therefore, neither addressed by the State nor considered by the trial court. This argument was not properly preserved for review by this court. *See State v. Brown*, 434 So.2d 399 (La.1983).

This assignment lacks merit.

<u>*Alleged Coercion*</u>

The defendant argues that the police obtained his admissions through improper influence, thus violating *Bram v. United States*, 168 U.S. 532, 18 S.Ct. 183 (1897), and, also, that the police used lies to obtain his admissions. Again, defendant argues his trial counsel was ineffective. The two main arguments under this assignment are essentially the same in that they allege that the investigating officers made untrue representations in order to coax the defendant into admitting his involvement.

11

The defendant argues that Deputy Donald Delouche lied during the interrogation, stating that witnesses placed him at the scene of the crime. However, at trial, one of the defendant's attorneys withdrew his objection to this statement. Next, he complains that Deputy Delouche improperly confronted him with statements from his daughters, indicating that he had changed his clothes at some point during the morning. Despite the defendant's contention, this statement was arguably true as one of the defendant's daughters testified at trial that he had changed clothes, although her re-direct testimony suggested he did not change clothes. The other daughter testified she did not recall how defendant was dressed. In any event, there appears to have been some factual basis for Deputy Delouche's remarks to the defendant.

The defendant also argues he was improperly exhorted to help himself by telling the truth. However, it is well-settled that such exhortations are not improper. *State v. Robertson*, 97-0177 (La. 3/4/98), 712 So.2d 8, *cert. denied*, 525 U.S. 882, 119 S.Ct. 190 (1998).

We note that some of the comments complained of by the defendant were discussed at trial. Deputy Delouche acknowledged that, during the interrogation, he advised the defendant that the coroner had determined the victim's wounds ran from her left side to her right. On cross-examination of Deputy Delouche, the following colloquy occurred:

> Q     Deputy Delouche, do you recall that -- we're talking about the second video taped statement that hasn't been introduced into evidence yet -- do you recall that statement, sir?
>
> A     Yes, sir, I do.
>
> Q     Do you recall at some point in there, approximately 7:49 PM or 7:50 PM, telling the defendant, John Chesson, that you had spoken with the coroner and that the wounds to Ms. Thibodeaux's neck went from her left side to right?

A     Yes, sir, I do.

Q     Do you recall in fact demonstrating that to him, standing up in that --

A     Yes, sir.

Q     Had you in fact talked to the -- gotten an opinion either from Zeb Johnson or Dr. Welke insofar as the direction of the cut?

A     No, sir, I had not.

Q     What did you base that statement on?

A     My observations at the scene.

Q     And were you just doing a little name dropping by using the coroner's name?

A     That's correct.

          MR. KIMBALL [ASSISTANT DISTRICT ATTORNEY]:
               I tender the witness.

**CROSS EXAMINATION BY MR. WARE [Defense Counsel]:**

Q     Deputy -- Chief Delouche, that comment to -- that particular comment to Mr. Chesson was a lie.

A     That's correct, sir.

MR. WARE:
     And Your Honor, as to that, in all fairness to the State, and the chief-- and that's unfortunately proper interrogation.  And in fact, it's not hearsay because it's not something that Welke told Delouche, it's Delouche making it up.

THE COURT:
     Yeah, that's something you can ask in cross examination. It goes to the weight and credibility that the jury can find as to what that statement generated. Okay?

MR. KIMBALL:
     That's withdrawn? That's what you're saying?

MR. WARE:
     Yes.

MR. KIMBALL:
     So that objection is withdrawn.

13

THE COURT:
    You're withdrawing the objection?

MR. WARE:
    Right. He can do that. It's not hearsay.

THE COURT:
    Okay.

MR. WARE:
    I based it on hearsay, and it's not hearsay.

THE COURT:
    Then that objection is withdrawn.

Thus, it is clear the defendant's objection to Deputy Delouche's statement about the coroner's finding was waived and, accordingly, not preserved for review. The defendant further argues that Deputy Delouche misled him into thinking he had a viable opportunity to claim self-defense; however, this aspect of his argument was also waived by the defense counsel at the hearing on the motion to redact the defendant's videotaped statements. In addition to the objection being waived, we observe that the United States Supreme Court has stated:

> "[C]onfessions remain a proper element in law enforcement. Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence." 384 U.S., at 478, 86 S.Ct., at 1629. Ploys to mislead a suspect or lull him into a false sense of security that do not rise to the level of compulsion or coercion to speak are not within *Miranda*'s concerns. Cf. *Oregon v. Mathiason*, 429 U.S. 495-496, 97 S.Ct. 711, 714, 50 L.Ed.2d 714 (1977)(*per curiam*); *Moran v. Burbine*, 475 U.S. 412, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986)(where police fail to inform suspect of attorney's efforts to reach him, neither *Miranda* nor the Fifth Amendment requires suppression of prearraignment confession after voluntary waiver).

*Illinois v. Perkins*, 496 U.S. 292, 297-98, 110 S.Ct. 2394, 2397-98 (1990).

This assignment lacks merit.

*Sufficiency of the Record*

In this assignment, the defendant argues the record is incomplete as it does not contain a transcript of his Motion to Suppress Identification and because two bench conferences were not recorded.

With regard to the Motion to Suppress Identification, the minutes demonstrate that defense counsel withdrew the Motion to Suppress Identification on September 18, 2002, without a hearing on the matter. Accordingly, there could be no transcript. As far as the two unrecorded bench conferences that took place during the cross-examination of jailhouse informant Thomas Stewart, we note the following relevant passages. First, in questioning by defense counsel, a bench conference was held after the following discussion:

Q      And sometimes inmates and a lot of times inmates, young and old, particularly young and old, will say things that are not true to frighten off the other inmates from messing with them.

A      Yes, sir.

Q      That's not uncommon?

A      No, sir.

Q      You ever did that?

A      Yes, sir.

Q      Okay. You ever been prosecuted for what you said to others that wasn't true?

A      No, sir.

THE COURT:
       Mr. Ware come see.

(Bench conference outside the presence of the reporter. The proceedings resumed as follows)

BY MR. WARE:
Q      Have you ever lived at 301 Sowell Avenue in -- is it Georgia?

15

The other unrecorded bench conference occurred after this passage:

A     No, sir. I was not guarding the intake desk to see who put money on his account.

MR. WARE:
I ask this be marked as D-2. May I show it to the witness out of an -- he said he hadn*t seen it. So -- can*t identify it --

MR. KIMBALL:
Your Honor, again, I have no objection. That's one less thing I have to put in. So and it is a copy, I have no objection to that either.

THE COURT:
Let me talk to y'all outside for just a second.

(Bench conference outside the presence of the reporter. The proceedings resumed as follows)

THE COURT:
You may continue, Mr. Ware.

BY MR. WARE:
Q     You've read this letter. Right?

It does not appear that the unrecorded conferences were related to any objection by either party. We note that a number of bench conferences, when objections were raised, were recorded and are contained in the record. The trial court explained its procedure to the jury, as follows:

Ladies and gentlemen, just so that you*ll understand what*s going on, my job is like the gatekeeper to make sure that you hear what is relevant and admissible evidence.

It's the attorneys* job to object when they think that somebody is trying to put in something that is against the rules of evidence. Okay?

So that we don*t get you confused about what*s going on, we*re going to take a break every time that there is a particular problem about rulings on that, and go outside your presence, rather than having you go outside.

There are arguments and things, and I don*t want you to get confused about that. I only want you to make your decisions based on what you hear from here. Okay?

So I apologize if it*s inconvenient for you, but that*s the way it*s gonna happen. We*re going to step outside, and you*re not going to hear, and you don*t draw any inferences from anything that we do out there. Okay?

You base your decision on what comes into the record this way. Everybody understand that? All right. Mr. Kimball.

While observing that La.Const. art. I, § 19 ensures the right to an appeal based upon a complete record of the evidence on which a judgment is based, the Louisiana Supreme Court has explained that "inconsequential omissions or slight inaccuracies do not require reversal, as an incomplete record may nonetheless be adequate for appellate review." *State v. Deruise*, 98-0541, p. 11 (La. 4/3/01), 802 So.2d 1224, 1234, *cert. denied*, 534 U.S. 926, 122 S.Ct. 283 (2001). Furthermore, "a defendant is not entitled to relief because of an incomplete record absent a showing of prejudice based on the missing portions of the transcripts." *Id.*

Defendant has failed to show, or even suggest, how the unrecorded nature of the two bench conferences prejudiced his case. They do not appear to be based on any objection by counsel. Accordingly, this portion of the assignment lacks merit.

For the reasons discussed, this assignment lacks merit.

*Sanity Commission*

The defendant claims that the Sanity Commission erred by not determining his sanity at the time of the crime. He argues the Sanity Commission "did not finish the job it was hired for." On November 2, 2001, the defendant filed a "Motion for Appointment of Psychiatrist." The trial court granted the motion only to the extent that it sought a determination of defendant's ability to assist counsel at trial, and appointed a Sanity Commission. Order language regarding a determination of the defendant's mental capacity at the time of the offense was marked through. On November 5, 2001, the trial court also discussed the motion for a psychiatrist on the

17

record, stating that he would not appoint a psychiatrist to determine mental capacity at the time of the offense, but would only appoint the sanity commission to determine the defendant's capacity to proceed.[1]

As it determined the defendant's capacity to proceed, the Sanity Commission completed the "job" it was ordered to undertake. It was not ordered to inquire as to the defendant's mental state at the time of the offense. The trial court indicated that defense counsel could do so if it so chose. The defendant does not contest the propriety of the orders themselves. This argument lacks merit.

*Introduction of Allegedly Irrelevant Evidence*

Next, the defendant argues the trial court erred by allowing irrelevant evidence to be introduced in several instances. Specifically, he refers to: [T]he introduction of a pair of men's pants and a gym bag; similarly; the testimony of Agnes Robert, his estranged wife at the time of the offense; evidence of a threat by him against Ms. Robert's brother; the introduction of two knives and some clothes, which the defendant contends were not related to the crime.

La.Code Evid. art. 403 provides:

> Although relevant,[2] evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue influence, or waste of time.

However, even the erroneous admission of irrelevant evidence does not require a reversal of a conviction if the error is harmless beyond a reasonable doubt. *See State v. Wille*, 559 So.2d 1321 (La.1990), *cert. denied*, 506 U.S. 880, 113 S.Ct. 231 (1992), *citing Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824 (1967). In *Sullivan*

---

[1] We also note that the defendant did not enter a plea of "not guilty by reason of insanity."

[2] "Relevant evidence" is defined by La.Code Evid. art. 401 as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

*v. Louisiana*, 508 U.S. 275, 279, 113 S.Ct. 2078, 2081 (1993), the United States Supreme Court explained that:

> Harmless-error review looks . . . to the basis on which "the jury *actually rested* its verdict." *Yates v. Evatt*, 500 U.S. 391, 404, 111 S.Ct. 1884, 1893, 114 L.Ed.2d 432 (1991)(emphasis added). The inquiry, in other words, is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in *this* trial was surely unattributable to the error.

Thus, even if we were to conclude that the evidence complained of was erroneously admitted, which we do not, our review of the record indicates that any such error would be harmless. The State's case included admissions the defendant made to police, and to fellow prisoner Thomas Stewart. Thus, we conclude that even if the individual items of evidence at issue lacked relevance, or were only marginally relevant, the defendant has failed to demonstrate that they improperly prejudiced his case.

For the reasons discussed, this assignment lacks merit.

*Preservation of Evidence*

In this assignment, the defendant argues the State failed to comply with statutory discovery rules, or to preserve exculpatory evidence pursuant to *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194 (1963) and *Kyles v. Whitley*, 514 U.S. 419, 115 S.Ct. 1555 (1995). He argues authorities denied him material information by destroying their initial handwritten investigative notes and preparing a joint supplemental report instead. He contends the supplemental report deliberately omitted exculpatory information, partly through the assistance of an unknown "government official."

The defendant alleges the initial notes contained details regarding his interrogation, specifically police promises to help the defendant if he would only tell the truth. He also alleges police failed to preserve information concerning cell mate

19

Thomas Stewart. According to the defendant, the information includes a statement, never provided to him, that Mr. Stewart made to Deputy Delouche. He contends that information also exists indicating that Stewart is a "career snitch for the government." He also argues the State should have run scientific tests to compare hair taken from the victim with hair taken from the cowboy hat seized from his room.

These assertions were not raised below and, accordingly, will not be considered for the first time on appeal. *See* La.Code Crim.P. art. 841. Also, in the context of *Brady* and *Kyles*, we note that the defendant does not allege he has discovered exculpatory information of which he was previously unaware.

For these reasons, this assignment is not further considered.

*Hearsay Testimony*

Next, the defendant argues the trial court erred by allowing the State to adduce inadmissible hearsay testimony at various points in the trial. He first argues that hearsay statements were introduced through his videotaped confessions. The defendant's argument does not assert whether he believes that the statements in their entirety are hearsay or whether only certain statements contained therein are hearsay.

If referencing the statements in their entirety, we observe that the statements were admissible, under La.Code Evid. art. 801(D)(2)(a), which states:

**D. Statements which are not hearsay.** A statement is not hearsay if:

. . . .

**(2) Personal, adoptive, and authorized admissions.** The statement is offered against a party and is:

(a) His own statement, in either his individual or a representative capacity[.]

If the present argument is attacking the admissibility of various remarks made during the statements he gave to police, the defendant fails to specify exactly which

20

parts of the statements he is attacking.  Accordingly, the court is left with nothing to review.

The defendant argues statements made about Deputy Larry Kelland's recovery of a pair of men's pants and a gym bag which he contends constituted inadmissible hearsay.  However, the record reveals that the defendant did not lodge a contemporaneous objection to Deputy Kelland's testimony regarding the recovery of the items.  This lack of a contemporaneous objection prohibits review, as La.Code Crim.P. art. 841(A) explains:

> An irregularity or error cannot be availed of after verdict unless it was objected to at the time of occurrence.  A bill of exceptions to rulings or orders is unnecessary.  It is sufficient that a party, at the time the ruling or order of the court is made or sought, makes known to the court the action which he desires the court to take, or of his objections to the action of the court, and the grounds therefor.

Next, he complains that witness Ruby Champagne, one of his daughters, was allowed to give hearsay testimony.  When Ms. Champagne testified that the defendant told her the Devil told him to kill someone, and that "the one he really wanted was his sister-in-law," defense counsel did not object.  Counsel later tried to have similar remarks redacted from the videotaped statements, but at that point Ms. Champagne's testimony, along with similar testimony from Francis LeBlanc, was before the jury.  Thus, La.Code Crim.P. art. 841 bars review of this argument.

Ms. Leblanc, another of the defendant's daughters, also testified that the defendant stated the Devil had told him to kill someone.  Again, defense counsel did not object.  Later, when she testified that the defendant made threats regarding her brother-in-law, counsel objected, but apparently on the basis that it was irrelevant and highlighted other bad acts.  Again, even if the objection was based upon hearsay, the statement was admissible pursuant to La.Code Evid. art. 801(D)(2)(a), as stated above.

21

The defendant also argues the videotape contained improper hearsay by Deputy Delouche, in which he told the defendant that police had a witness that said the victim was dead and that he had seen the defendant near the crime scene. We observe that, even if such statements were inadmissible hearsay, they clearly did not prejudice the defendant's case. Witness Daniel Oakley testified at trial that he could not identify the defendant as the white male he had seen near the crime scene. Furthermore, the defendant withdrew his objection at trial.

The defendant also complains of a statement Deputy Delouche made on the videotape, regarding a statement by Deputy Kelland, "that he talked to the husband about picking up the knife." The defendant attempted to have this remark redacted from the videotape, arguing it was hearsay and that Deputy Kelland had not corroborated the remark during his testimony. The objection was overruled. Even if the statement was inadmissible hearsay, it did not prejudice the defendant's case, as the remarks merely referred to police efforts to recover the murder weapon. The defendant's statements to police and the cell mate's testimony clearly inculpated the defendant in the victim's knifing death. Thus, we conclude that the verdict was not attributable to these statements. Therefore, any error regarding the statement was harmless.

The defendant also argues that Deputy Delouche's testimony that Ms. Champagne brought him a knife, and had told him that the defendant used it once to open a bathroom door for her, was improper hearsay. Again, Deputy Delouche's testimony, even if inadmissible hearsay, did not contribute to the verdict. The knives introduced at trial were not identified as the murder weapon, and neither tested positive for the presence of blood. The evidence showed that the victim was killed

22

with a knife, regardless of where the knife was obtained. Further, the defendant did not dispute the victim was killed with a knife. Rather, he claimed self-defense.

Finally, the defendant argues the testimony of informant Thomas Stewart was composed entirely of hearsay. However, Mr. Stewart's testimony regarding the defendant's confession to him was clearly admissible under La.Code Evid. art. 801(D)(2)(a). The defendant's further assertion that Mr. Stewart has long received favors from authorities, and should not be trusted is unrelated to hearsay principles.

This assignment lacks merit.

*Right to Remain Silent*

In his eighth pro se assignment, the defendant claims he invoked his right to remain silent during questioning, but that police continued to question him, thus violating his constitutional right against self-incrimination.

In *Robertson*, 712 So.2d at 29, the Louisiana Supreme Court explained:

> In *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the United States Supreme Court provided a person in custody must be given certain warnings before interrogation may commence in order to safeguard his Fifth Amendment right against self-incrimination. *See also State v. Davis*, 92-1623, p. 19 (La. 5/23/94), 637 So.2d 1012, 1024, *cert. denied*, 513 U.S. 975, 115 S.Ct. 450, 130 L.Ed.2d 359(1994). After these warnings have been given, if the individual indicates at any time that he wishes to remain silent, the interrogation must cease. However, when the protections provided by *Miranda* are not specifically invoked, police may continue to question the suspect in the hope of obtaining a statement. *Green*, 94-0887 [ (La. 5/22/95) ] at p. 10 n. 8, 655 So.2d [272] at 280, n. 8. For a statement which was obtained where an individual's right to remain silent was **not** invoked after being informed of his *Miranda* rights to be admissible, it is the State's burden to show defendant waived his rights prior to speaking. *Davis*, 92-1623, at p. 19, 637 So.2d at 1024; *Green, Id.* The waiver must be knowing and intelligent under the totality of the circumstances which include the "particular facts and circumstances surrounding the case, including the background, experience, and conduct of the accused." *Green*, 94-0887 at p. 11, 655 So.2d at 280.

Furthermore, a panel of this court, in *State v. Reed*, 00-1537, p. 20 (La.App. 3 Cir. 3/6/02), 809 So.2d 1261, 1274, *writ denied*, 02-1313 (La. 4/25/03), 842 So.2d 391, stated:

> In *Davis v. United States*, 512 U.S. 452, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994), the United States Supreme Court held that an unambiguous and clear assertion of the right to remain silent was necessary to trigger the rule that interrogation must cease upon invocation of the right. In *Robertson*, 712 So.2d 8, the Louisiana Supreme Court held that the defendant did not invoke his right to remain silent when he told the officers that he had nothing to say about the murders. Robertson never said he did not want to speak to the police at all, only that he had nothing to say. The supreme court noted:
>
>> The fact defendant continued to speak to police reflected an intent to continue the exchange, thus giving effect to the "fundamental purpose of . . . *Miranda*," which was to "assure that the individual's right to choose between speech and silence remains unfettered throughout the interrogation process."
>
>> *Id.* at 31, *citing*, *State v. Green*, 94-887 (La.5/22/95); 655 So.2d at 280, n. 8 [quoting *Connecticut v. Barrett*, 479 U.S. 523, 528, 107 S.Ct. 828, 831, 93 L.Ed.2d 920 (1987)].
>
> Accordingly, we find Defendant did not specifically invoke the right to remain silent and that he voluntarily and intelligently waived his right to remain silent under the circumstances. Thus, the trial court did not err when it denied Defendant's motion to suppress the statement. This assignment is without merit.

We note that the issue of the defendant's assertion that he invoked his right to remain silent was addressed at the Motion to Redact. The following portion of the statement was transcribed in the record, with defense counsel entering an objection after the trial court stopped the tape. The transcribed portion reflects:

> MR. DELOUCHE: Are you telling me you don't want to talk to me any more, John?
>
> MR. CHESSON: Not right now. Y'all tryin' to pressure this on me.
>
> MR. DELOUCHE: No, I'm not trying to -- I'm telling you what we're told so that we can give you a chance to straighten this out.

24

> MR. CHESSON: Well, I straightened it all I could. I still see the boots in the house, I still see the shirt in the house under my hat. And the lady -- I did not leave and come back. And I didn't walk to the truck and come back.
>
> MR. DELOUCHE: Okay. You told me that you remembered having blood on your hand.
>
> MR. CHESSON: Yes, sir.
>
> MR. DELOUCHE: All right. Which hand?
>
> MR. CHESSON: This one." [sic]

THE COURT:
Stop it.

MR. WARE:
He's invoked his right to remain silent.

The record indicates that this specific issue was not ruled upon at the Motion to Suppress hearing. The focus was upon the defendant's right to counsel, rather than his right to remain silent. However, as shown above, the defendant later raised his right to silence at the Motion to Redact hearing.

Our review of the transcript indicates that the defendant's language did not suggest that he wanted to stop speaking. His remarks suggested that he had no more to say. Although the defendant expressed some concern that "Y'all tryin' to pressure this on me," he continued to speak freely.

As the trial court reasoned:

> And from my opinion in reviewing the video tape, it seems to me that although he said -- he continued on. He didn't revoke [sic] the right to have an attorney, he continued talking, deputy said what do you want -- what does that mean, and he continued answering the question.

As we find no error in this conclusion, this assignment lacks merit.

*Presence at hearing on Motion to Suppress Identification*

The defendant complains that he was denied the right to be present at the hearing on the Motion to Suppress Identification. However, as stated above, the

25

minutes indicate that this motion was withdrawn on September 18, 2002, and no hearing was held on this motion. This assignment is moot.

*Reliability of Testimony*

In this assignment, the defendant is concerned with the alleged unreliability of Thomas Stewart, the cell mate informant. The defendant does not highlight any specific aspect of the testimony as unreliable and does not try to show any internal inconsistency in his testimony. Rather, the defendant's argument is that informants, in general, are unreliable. Accordingly, this portion of the defendant's assignment leaves the court with nothing substantive to review.

The defendant also complains that a pair of jeans, a gym bag, and two knives should not have been introduced. He argues their probative value was outweighed by their prejudicial effect. He does not use exhibit numbers or page numbers in his argument, so it is not clear exactly which evidence he is contesting, other than the knives. However, we observe that the knives designated as S-26 and S-29 were introduced without objection. A pair of jeans introduced as part of S-30, in globo, was also entered without objection. Thus, pursuant to La.Code Crim.P. art. 841, referenced above, the introduction of these items will not be reviewed on appeal.

The State introduced another pair of jeans, and a gym bag, as S-16 and part of S-17, respectively. The defendant objected to these items, questioning the chain of custody and the items' relevance. With regard to relevance, the claim the defendant repeats on appeal, the State acknowledged the probative value was low, as no blood was found on the jeans or other items at issue. However, the prosecutor argued that he did not want to appear to be hiding any evidence. The trial court agreed the probative value was low, but reasoned the prejudicial effect was low, as well.

We find no error in the trial court's determination. Further, even if it was error to admit the marginally-relevant evidence, the verdict was not attributable to such items. There was no indication these items had any blood on them. When forensic serologist Tracy Legros testified, these items were not even discussed. Accordingly, no prejudice would have resulted.

This assignment lacks merit.

*Confrontation of Witnesses*

The defendant next alleges he was prevented from making a full cross-examination, and thus his constitutional right to confrontation of witnesses was denied. He argues he was prevented from fully cross-examining an officer, Glen Berry, regarding when the defendant was actually detained by police.

The colloquies cited by the defendant reveal the trial court overruled the State's objection to the defendant's cross-examination of Glen Berry on the detention issue. The second colloquy includes issues of hearsay and police deception, but does not appear to contain a cross-examination problem. Accordingly, this assignment lacks a factual basis and, therefore, lacks merit.

*Introduction of Photographs*

The defendant also contends that the trial court erred by allowing the State to introduce gruesome photographs of the victim into evidence.

In *State v. Dunn*, 01-1635, p. 21-22 (La. 11/1/02), 831 So.2d 862, 880 (citations omitted), the Louisiana Supreme Court explained the analysis for photographic evidence, stating:

> The State is entitled to the moral force of its evidence, and post-mortem photographs of murder victims are admissible to prove *corpus delicti*, to corroborate other evidence establishing cause of death, as well as location and placement of wounds, and to provide positive identification of the victim. Photographic evidence will be admitted

unless it is so gruesome that it overwhelms jurors' reason and leads them to convict without sufficient other evidence.

Our review of the photographs at issue suggests that they were not so gruesome as to unfairly prejudice the defendant's case. Furthermore, the probative value of the photographs is obvious as the defendant alleged self-defense and the injuries occurred as a result of him pushing the victim's arm away from him. The photographs tend to prove the injuries were more severe than those described by the defendant's version of events.

This assignment has no merit.

*Ineffective Assistance of Counsel*

In a number of the above assignments, the defendant contends that his counsel was ineffective in a number of regards. However, each of the arguments will require development of evidence and is best deferred to consideration during post-conviction proceedings. *See State v. Watson*, 00-1580 (La. 5/14/02), 817 So.2d 81.

In his thirteenth assignment of error, however, the defendant claims that his trial attorneys were ineffective for failing to request a "great caution" jury instruction, in regard to the testimony of jail informant Thomas Stewart. Unlike the other arguments regarding counsel, this ineffectiveness claim is easily resolvable through the appellate record. Accordingly, we proceed with the analysis. In *State v. Lacaze*, 99-0584, p. 20-21 (La. 1/25/02), 824 So.2d 1063, 1078-79, (footnotes omitted), *cert. denied*, ___ U.S. ___, 123 S.Ct. 263 (2002), the Louisiana Supreme Court explained:

> A criminal defendant is guaranteed the effective assistance of counsel. U.S. Sixth Amendment; La.Const. art. I § 13. To prevail on a claim of ineffective assistance, a defendant must demonstrate (1) that his attorney's performance fell below an objective standard of reasonableness under prevailing professional norms; and (2) that counsel's errors or omissions resulted in prejudice so great as to undermine confidence in the outcome. The Sixth Amendment does not guarantee "errorless counsel [or] counsel judged ineffective by hindsight," but counsel reasonably likely to render effective assistance.

Judicial scrutiny must be "highly deferential" and claims of ineffective assistance are to be assessed on the facts of the particular case as seen from "counsel's perspective at the time," hence, courts must indulge "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."

Claims of ineffective assistance are generally relegated to post-conviction, unless the record permits definitive resolution on appeal. The same approach is followed in capital cases. When the record permits, this court will reach the merits of claims about counsel's performance and grant relief when appropriate.

We conclude that counsel's performance was not deficient, as "great caution" instructions are required when a case involves uncorroborated accomplice testimony. However, such instructions are not mandatory where an accomplice's testimony is materially corroborated. *State v. Castleberry*, 98-1388 (La. 4/13/99), 758 So.2d 749, *cert. denied*, 528 U.S. 893, 120 S.Ct. 220 (1999). Testimony is materially corroborated "if there is evidence that confirms material points in an accomplice's tale, and confirms the defendant's identity and some relationship to the situation." *State v. Schaffner*, 398 So.2d 1032, 1035 (La.1981), *citing United States v. Lee*, 506 F.2d 111 (D.C.Cir.1974), *cert. denied*, 421 U.S. 1002, 95 S.Ct. 2403 (1975).

As shown in the *Jackson* review, and the recitation of facts earlier in this memorandum, Thomas Stewart's testimony was corroborated by the defendant's own statements to police. Further, Stewart was not an accomplice to the crime. Accordingly, a "great caution" instruction was not required and the failure to include the instruction did not result from ineffective assistance of counsel.

This assignment lacks merit.

*Indictment*

In his fourteenth and fifteenth assignment, the defendant argues the indictment was defective. First, because the grand jury foreperson was improperly selected, and second, because of discrimination in selection of the grand jury. Under both

29

assignments, the defendant acknowledges that he did not file motions to quash based on these arguments. He acknowledges that this failure would normally bar his claims, but alleges his trial counsel was ineffective for failing to raise them in a timely manner.

We observe that the current record does not contain the statistical information on such matters as race and gender that would be needed to assess this ineffective assistance of counsel claim. The defendant attempts to surmount this deficiency by adopting "all arguments, law, statements, facts, and statistics" presented in *State v. Langley*, 95-1489 (La. 4/3/02), 813 So.2d 356. Such an adoption of a separate, distinct case is inappropriate. No part of *Langley* was made a part of the current record, therefore that case's underlying facts and arguments are not appropriate for consideration. *See, e.g., State v. Arnold*, 99-742 (La.App. 3 Cir. 4/11/01), 801 So.2d 408, *reversed on other grounds*, 01-1399 (La. 4/12/02), 816 So.2d 289. Again, in the event the defendant seeks review by post-conviction relief, this argument can be presented at that time. This deferral provides the defendant with an opportunity to develop the necessary evidence and the State with the opportunity to respond.

*Exculpatory Evidence*

In his final assignment, the defendant argues that the State improperly withheld exculpatory evidence, thus violating *Brady*, 373 U.S. 83, 83 S.Ct. 1194. First, he argues the State withheld information regarding the unreliability of informant Thomas Stewart. Specifically, he alleges Stewart gave a statement to police before trial and that said statement contradicted his trial testimony on several points. He also alleges the State had information that Stewart had testified in previous cases in order to gain the State's favor. Next, the defendant complains the State withheld or destroyed investigative notes that would have revealed perjury on the part of several

investigating officers, including Deputy Delouche. According to the defendant, said police notes would also reveal information regarding the unreliability of the informant, Stewart. Defendant also prays that the alleged *Brady* violations be considered cumulatively.

We addressed the destruction of initial handwritten investigative notes above. To the extent the defendant makes allegations regarding the contents or nature of the alleged *Brady* materials, he lacks record evidence to support his claims. Further, he does not allege any newly-discovered evidence, either documentary or testamentary, to support his allegations.

In the event such evidence exists, the defendant will have an opportunity to develop that evidence in post-conviction proceedings. However, in its present posture, the assignment lacks any factual basis and, therefore, lacks merit.

## DECREE

For the foregoing reasons, the defendant's conviction and sentence are affirmed. The matter is remanded with instructions to the trial court to inform the defendant of the provisions of La.Code Crim.P. art. 930.8 by sending appropriate written notice to the defendant within ten days of the rendition of this opinion. The trial court is further instructed to file written proof in the record of the proceedings that the defendant received the notice.

**AFFIRMED; REMANDED WITH INSTRUCTIONS.**

31