820 So.2d 533 (2002)
STATE of Louisiana
v.
Byron VIGNE.
No. 2001-KK-2940.
Supreme Court of Louisiana.
June 21, 2002.
*534 Ron A. Austin, Westwego, Ike Spears, New Orleans, Counsel for Applicant.
Richard P. Ieyoub, Attorney General, Harry F. Connick, District Attorney, Stephenie J. Louthan, New Orleans, Counsel for Respondent.
JOHNSON, Justice.
The trial court found that the evidence presented by the State was insufficient to show that, absent an inculpatory statement defendant made to police, the officers would inevitably have discovered narcotics in a cooler in the ceiling tiles of a bedroom when they searched the residence pursuant to a valid search warrant. In a split decision, the court of appeal granted the State's application for supervisory writs and reversed the trial court's decision. We granted this writ of certiorari to determine whether the court of appeal erred in reversing the trial court's decision. After a review of the transcripts and documents contained in the record, we conclude that the trial court's ruling was supported by the record. Accordingly, we reverse the court of appeal's decision.

FACTS AND PROCEDURAL HISTORY
The transcript of the suppression hearing reveals that Detective Lawrence Jones of the New Orleans Police Department received a tip from a confidential informant that a man nicknamed "Booney," *535 who lived at 1223 Marigny Street, New Orleans, Louisiana, was selling wholesale quantities of crack cocaine. Detective Jones subsequently learned that defendant, on probation for a narcotics conviction, lived at that address. The computer at the police station showed that defendant, Byron Vigne, used the nickname "Booney." Subsequently, Detective Jones obtained defendant's photograph and presented it to the informant, who then identified defendant as the individual selling the narcotics.
The informant agreed to participate in a controlled drug buy on or about February 9, 2000. Accordingly Detective Jones searched the informant's person, gave him $50.00, and took him to the 1200 block of Marigny. Detective Jones observed from an unmarked car parked within a block of defendant's residence as the informant met with defendant outside the house. Defendant and the informant conversed briefly, then defendant went inside the residence alone. Shortly thereafter, he returned outside and gave the informant a small object in exchange for currency. The informant then returned to the car and gave Detective Jones a rock of cocaine he had purchased from defendant.
Based on the foregoing evidence, Detective Jones obtained a search warrant for 1223 Marigny Street. The warrant, issued on February 10, 2000, specifically authorized the officers to search the premises, "including all curtilage" for "all contraband, controlled dangerous substances, more particularly crack cocaine, along with any concomitant physical evidence, either substantive or trace, associated with its use, possession, packaging, and/or distribution."
The warrant was executed on February 14, 2000. Detective Jones testified that when the officers arrived at the residence, several people, including defendant, were standing outside of the house. Some of the officers detained the bystanders while others entered the residence to execute the warrant. Everyone was ordered inside the house, where the officers advised the detainees of their Miranda rights. The officers determined that the other persons had no connection with the residence and released everyone but defendant and his girlfriend, Dinah Dedmond, who also lived at the house.
Detective Jones stated that he re-administered Miranda warnings to defendant and Dedmond, provided them with a copy of the search warrant, and informed them that the officers planned to search the residence. The colloquy was as follows:
Q. And once you provided the search warrant, Detective, what actions did you take then?
A. At that point I informed the defendant that myself and other detectives was going to conduct a [systematic] search of the residence. I informed him of the location that we were going to search, and I also asked him if he had any type of narcotics to declare.
Q. What location did you tell them to search?
A. Specifically the ceiling panels, the curtilage area, the backyard, all the residence, throughout the residence.
The detective then described the ceiling, stating that it had removable panels, which could be pushed up manually. Detective Jones stated that when he mentioned the ceiling, defendant "became very nervous" and started "shaking his feet and moving his legs and started looking up and down." He then asked defendant again whether he wanted to declare the presence of narcotics. Defendant then gestured with his *536 head toward "the second bedroom."[1] Detective Jones, accompanied by two other detectives, walked from the living room to the second bedroom, where defendant told them that "the narcotics [were] in the ceiling." The detective testified that defendant directed him to the second panel in the bedroom, and he and the other detectives pushed it open. A blue and white cooler then fell to the floor and when the officers opened it, they found that it contained "large bags of narcotics, a scale and several razor blades."
According to the police incident report, defendant was again advised of his Miranda rights and taken into police custody. Defendant's girlfriend was released after the officers determined the she "had no nexus to the narcotic trafficking," and she had no outstanding warrants.
On cross-examination, Detective Jones indicated that each time he administered the Miranda warnings, he read them from a card that he carries in his pocket when executing search warrants. However, he neither indicated exactly what "rights" he recited to defendant in the ensuing police report, nor did he include a copy of the card with it. He also admitted that he could not recite the rights required by Miranda from memory. Nonetheless, the detective claimed that he recited the Miranda warnings, and defendant made no indication suggesting that he did not understand them.
Detective Jones also admitted on cross that he did not count the number of tiles in the ceiling. However, he indicated that by pushing up a single tile, it was possible to see whether anything was stored in the ceiling in the entire room. He stated that he did not personally search the ceiling areas of the remaining rooms nor did he have first-hand knowledge of whether the other rooms had been subsequently searched. However, because the police report indicated that a search of the residence had been conducted, he stated that "[i]f there were drop ceilings in other bedrooms, I'm sure they also was checked."
The trial court granted the motion to suppress. The trial court was unconvinced that defendant had been properly Mirandized before making his statement. The trial court stated:
When this officer was called to testify in a motion hearing, he could not state which rights he read to the Defendant. He only stated that he read him his Miranda warnings, but he couldn't state what those Miranda warnings were.
* * *
He couldn't state what they were. He said he read them from a card. He didn't have the card with him. You want me to assume that he read the proper Miranda warnings and that the Defendant understood those Miranda warnings and waived them, but, yet, the officer couldn't testify as to what he read, only the fact that he read them. I don't know what happened at that time. There's a heavy burden on the State to prove that, or to show that the Defendant was read his Miranda warnings and he understood those Miranda warnings and waived those Miranda warnings. And, so far, you haven't carried that burden....
The trial court also found that the State failed to prove, by a preponderance of the evidence, that the officers would inevitably have discovered the evidence had defendant *537 failed to alert them to its precise location.
The State sought supervisory review of the trial court's decision. In a split decision, the court of appeal granted writs and found that the state's failure to introduce evidence demonstrating that defendant understood his rights "could have rendered" his subsequent gesture and statement indicating the location of the drugs in the house involuntary. However, the majority concluded, even assuming as much, the evidence should have been admitted pursuant to the "inevitable discovery" exception to the exclusionary rule. The majority reasoned that Detective Jones testified that defendant only alerted the officers to the exact location of the narcotics after the detective informed him that pursuant to the warrant, the officers planned on searching the area above the ceiling tiles.
Judge Love dissented, noting that "[i]mplicit in the judge's finding is a belief that the officers would not have searched the ceiling without [defendant's] statement." Ultimately, because the dissenter did not detect manifest error in the court's finding of fact, she concluded that the inevitable discovery doctrine was inapplicable, and accordingly, she would have denied the state's writ application and left the ruling suppressing the evidence undisturbed.

DISCUSSION
A trial judge's ruling on whether or not a statement is voluntary is given great weight and will not be disturbed on appeal unless clearly unsupported by the evidence. State v. Thornton, 351 So.2d 480, 484 (La.1977). Before a confession may be introduced into evidence, the state must establish that the accused was advised of his constitutional rights under Article 1, Section 13 of the Louisiana Constitution and the Supreme Court's decision in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); State v. Simmons, 443 So.2d 512 (La.1983). In Miranda, the United States Supreme Court recognized the coercive atmosphere created by police custody and established a procedural mechanism to safeguard the exercise of a defendant's Fifth Amendment rights. Before interrogating a suspect in custody, law enforcement officials must inform the suspect that he has the right to remain silent, that his statements may be used against him at trial, that he has a right to an attorney, and that if he cannot afford an attorney, one will be appointed for him.
Even when a defendant has not expressly invoked his rights under Miranda, "[t]he courts must presume that a defendant did not waive his rights." North Carolina v. Butler, 441 U.S. 369, 373, 99 S.Ct. 1755, 1757, 60 L.Ed.2d 286 (1979). A waiver is not established by showing that a defendant was given the complete Miranda warnings and thereafter gave an incriminating statement. 2 Wayne R. LaFave, Jerold Israel, Nancy King, Criminal Procedure, § 6.9(d). Moreover, it is well-settled that a "heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel." Tague v. Louisiana, 444 U.S. 469, 470, 100 S.Ct. 652, 653, 62 L.Ed.2d 622 (1980).
The facts of Tague are remarkably similar to the facts presented herein. In that case, after his arrest, the defendant made an inculpatory statement to the arresting officer. At the suppression hearing, the arresting officer testified that he read the defendant his rights from a card. However, he "could not recall whether he asked petitioner whether he understood the rights as read to him." The officer also "couldn't say yes or no" whether he *538 rendered any tests to determine whether the defendant "was literate or otherwise capable of understanding his rights." The trial court denied the defendant's motion to suppress the inculpatory statement, and it was used during his trial, and the defendant was convicted. The defendant appealed his conviction, contending that the arresting officer failed to inform him of each of his constitutional rights under Miranda. This court affirmed the defendant's conviction and sentence, stating:
We are not willing to hold that the defendant was not informed properly of his constitutional right to remain silent because the arresting officer could not remember what "Miranda rights" were in the absence of the white card on which such rights were printed. In view of the officer's inability to remember these rights independently without a card, we believe that any attempt by him to give such rights to an accused without reading therefrom would, indeed, have been suspicious as to adequacy of the advice. In short, his failure on the witness stand to remember what Miranda rights were is not proof they were not given by the officer in the manner stated. On the hearing as to admissibility of defendant's statement, defendant introduced no evidence to negate the arresting officer's testimony that defendant was informed of his rights. The reading of the Miranda rights from a card was adequate, and has even been held to be preferable to giving an accused a copy to read for himself. United States v. Choice, 392 F.Supp. 460 (E.D.Pa.1975); Cf. United States v. Bailey, 468 F.2d 652 (5th Cir. 1972).
* * *
Absent a clear and readily apparent lack thereof, it can be presumed that a person has capacity to understand, and the burden is on the one claiming a lack of capacity to show that lack.... When there is nothing in the speech or manner of a person to call attention to a lack of capacity, we do not regard that an arresting officer has an obligation to take any special measures to be assured of that person's capacity before proceeding to question him.
State v. Tague, 372 So.2d 555, 557-58 (La. 1978). The United States Supreme Court granted the defendant's petition for certiorari and reversed this court's ruling. The Court stated that there was no evidence introduced to prove that the defendant had knowingly and intelligently waived his rights before making the inculpatory statement.
In this case, Detective Jones testified that he read the Miranda warnings to defendant from a card he carries with him while executing search warrants. He further testified that after he read defendant his rights, he asked him whether there were any narcotics on the premises that he wanted to declare. Thereafter, defendant indicated the location of the drugs.
It is evident from the detective's testimony that he made no effort to ascertain whether defendant intelligently waived his rights. He apparently did not ask defendant whether he understood his rights, and he made no efforts to determine whether defendant was capable of understanding his rights. Detective Jones merely stated that defendant made no indication to suggest that he did not understand his rights. Furthermore, the trial court was unpersuaded by the officer's testimony that defendant received the proper Miranda warnings prior to alerting the officers to the location of the contraband because Detective Jones never specified, either in his testimony, or in the police report, precisely which rights, under Miranda, he read. *539 After a review of the record, we find that the evidence the State introduced to demonstrate that Detective Jones adequately advised defendant of all of his rights required by Miranda was equivocal at best. More importantly, the state presented very little evidence that showed defendant made a knowing and voluntary waiver of those rights. In fact, the only evidence to that effect was the detective's testimony that defendant made no indication suggesting that he did not understand his rights before alerting the officer to the location of the narcotics. The state failed to introduce any documentary evidence or other testimony suggesting that defendant made a knowing and voluntary waiver of his rights before making his statement. Under these circumstances, we find that the trial court did not abuse its discretion when it determined that the state failed to comply with the dictates of Miranda.
Having concluded that defendant made the inculpatory statement in violation of his Miranda rights, we turn to the issue of whether the evidence obtained as a result of the statement falls into the "inevitable discovery" exception to the exclusionary rule. The inevitable discovery doctrine "is in reality an extrapolation from the independent source doctrine: Since the tainted evidence would be admissible if, in fact, it was discovered through an independent source, it should be admissible if it inevitably would have been discovered." Murray v. United States, 487 U.S. 533, 539, 108 S.Ct. 2529, 2534, 101 L.Ed.2d 472 (1988) (emphasis in original). A functional similarity exists between the independent source and inevitable discovery doctrines because they both seek to avoid excluding evidence the police "would have obtained ... if no misconduct had taken place." Nix v. Williams, 467 U.S. 431, 444, 104 S.Ct. 2501, 2509, 81 L.Ed.2d 377 (1984). The prosecution therefore bears the burden of proving by a preponderance of the evidence that "the information ultimately or inevitably would have been discovered by lawful means...." Id. Application of the inevitable discovery doctrine thus "involves no speculative elements but focuses on demonstrated historical facts capable of ready verification or impeachment...." Id., 104 S.Ct. at 2509 n. 5.
A determination of credibility lies within the sound discretion of the trial court, and like all questions of fact, is entitled to great weight and will not be disturbed unless clearly contrary to the evidence. State v. Vessell, 450 So.2d 938, 943 (La.1984). In this case, the trial court was faced with the testimony of Detective Jones, as well as the police report prepared by him, and concluded, "There was no indication that the police would have found anything in the ceiling in the house." The relevant portion of the suppression transcript shows the following:
COURT: What evidence do you have that the police would have found it there anyway?
[STATE]: Because the Defense was provided with a full police report. The Defense was provided with a copy of a search warrant.
COURT: No. No, I'm talking about the police officer. What made you think he was going to go to the ceiling.
[STATE]: He testified to that. He testified to that.
COURT: What did he say?
[STATE]: He said before they checked the ceiling he
COURT: Was there any evidencewas there any testimony that this police officer was going to go to the ceiling, regardless of whether or not the Defendant showed him where it was?

*540 [STATE]: That's what he said, your Honor. He said when he provided him with a copy of the search warrant, he said that he was going to check the curtilage of the home, which was to include the entire house, which also was going to encompass the ceiling tiles. And that's when the Defendant started getting nervous. He testified to that. That's in the police report. That's in the search warrant. Inevitable discovery, your Honor. If the Court finds an issue regarding an improper situation with Miranda, inevitable discovery would cure that.
* * *
COURT: [C]urtilage means any buildings attached to the original building. That's what curtilage means.
* * *
COURT: [Curtilage] doesn't mean the ceiling.
STATE: He said he was going to search the ceiling tiles, Judge. He told him that. It's in the police report. That's in the search warrant. That's in the search warrant....
COURT: Wait. That's in the search warrant about the ceiling?
STATE: In the search warrant.
* * *
COURT: Show me where it states that in the search warrant, that he was going to go to the ceiling?
[STATE]: ... Judge, I stand corrected on that, but it says "Premises" on the search warrant....
COURT: That's what I thought. That's what I thought.
* * *
COURT: The issue is just a fact issue, whether or not this police officer is going to find the evidence in the ceiling if not for the statement of the Defendant.
* * *
COURT: I looked at [inevitable discovery]. There's nothing in the record that states the police officers were going to find any evidence in the ceilings of a building, or the building or house that was searched.
* * *
[STATE]: ... The Court needs to recognize the fact that the officers didn't realize, or maybe they didn't know that ceiling tiles were in the house until they went into the house. You, as an officer in the past, Judge, once you enter a house and you see these drop ceilings with tiles, you're going to search that.
COURT: Not necessarily. Only if I have evidence that its up there. And, besides, why only go through one part of the ceiling and not the rest of the ceiling.
The trial court went on to find that the evidence presented by the State was insufficient to show that, absent defendant's inculpatory statement, the police officers would have inevitably searched the ceiling tiles and discovered the narcotics.
In reaching its conclusion that the doctrine of inevitable discovery is applicable to this case, the court of appeal stated:
[T]he trial court did not indicate it did not believe [Detective Jones'] statement, but rather its recitation of the facts indicates it may have forgotten the [detective] so testified.

*541 * * *
Contrary to the respondent's argument, the trial court did not state it found the [detective's] testimony incredible.
Our review of the record does not reveal that the trial court "forgot" that Detective Jones testified that the officers were planning to search the ceiling tiles even before defendant indicated the location of the drugs. In fact, above excerpts from the transcript shows that the trial court was quite cognizant of the detective's testimony. The trial court obviously did not believe Detective Jones' assertion that he had planned to search the ceiling all along. Moreover, the evidence revealed that the only ceiling tile searched in defendant's home was the ceiling tile in the second bedroom that defendant indicated contained contraband. Prior to defendant's inculpatory statement, no attempt had been made to even enter the bedroom in question, much less search the ceiling in it. Accordingly, we find that the trial court did not abuse its discretion when it rejected the State's argument regarding inevitable discovery. Therefore, we hold that the court of appeal erred in reversing the trial court's decision to suppress the evidence.

CONCLUSION
For the aforementioned reasons, we hold that the trial court did not err in granting defendant's motion to suppress. Accordingly, we reverse the court of appeal's decision.
REVERSED.
WEIMER, J., dissents.
TRAYLOR, J., dissents and assigns reasons.
VICTORY, J., dissents for the reasons assigned by Justice TRAYLOR.
TRAYLOR, J., dissenting.
Under the inevitable discovery doctrine, the evidence of narcotics in this case should not be suppressed. The prosecution has, by a preponderance of the evidence, proved that "the information ultimately or inevitably would have been discovered by lawful means." Nix v. Williams, 467 U.S. 431, 444, 104 S.Ct. 2501, 2509, 81 L.Ed.2d 377 (1984).
The evidence in this case was clearly contrary to the finding set out by the trial court. State v. Vessell, 450 So.2d 938, 943 (La.1984). Det. Jones testified that he intended to search the ceiling panels in the residence before the defendant's statement. Indeed, it was Det. Jones statement which caused the defendant to become "very nervous", start "shaking his feet and moving his legs", and start "looking up and down." It was only after Det. Jones declared his intent to search the ceiling panels that the defendant revealed the exact location of the narcotics. In addition, this intention was apparently reflected in the police report. Further, while the majority points out that Det. Jones only searched one bedroom, no reason existed to search the entire home once the defendant indicated the location of the narcotics. This fact, therefore, did not rebut Det. Jones' testimony that he intended to search the ceilings before the defendant confessed to the contraband. In light of Det. Jones' statement, the defendant's physical reaction to Det. Jones' statement, and the ease of searching this particular ceiling, the officers would have inevitably checked the ceiling tiles regardless of the defendant's help.
The majority relies heavily on the trial court's reasoning as an indication of Det. Jones' lack of credibility. The reasoning of the trial court does not state that the court believed Det. Jones lacked credibility. Rather, the trial court contended that *542 the search warrant did not specifically state the ceilings were to be searched and further contended that the broad categories of "curtilage" and "premises" did not prove that Det. Jones intended to search the ceiling panels. The trial court simply inserted its definition of "premises", implying that it could not include ceiling panels. However, a search warrant encompassing such broad categories should not be conclusive proof regarding intent to search a specific area. Under the trial court's reasoning, the search warrant would also have to name closets, drawers, and any other area not immediately visible to the eye to prove the officer's intent to search.
Contrary to the trial court's finding, the evidence introduced at the hearing indicated the officers intended to search the ceiling panels even before the defendant showed them where the cocaine was hidden. Because the cocaine would have inevitably been discovered during execution of the search warrant, I respectfully dissent.
NOTES
[1] Based on the officer's testimony, as well as the police incident report, there were at least three bedrooms in the residence.