# STATE OF LOUISIANA
# COURT OF APPEAL, THIRD CIRCUIT

## 04-1128

STATE OF LOUISIANA

VERSUS

DARREL G. LEDEE A/K/A SHANE ALLEN HENRY

**********

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF LAFAYETTE, NO. 92621
HONORABLE MARILYN CASTLE, DISTRICT JUDGE

*************

## SYLVIA R. COOKS
## JUDGE
*************

Court composed of Sylvia R. Cooks, John D. Saunders and Glenn B. Gremillion, Judges.

**AFFIRMED WITH INSTRUCTIONS.**

Michael Harson
Daniel M. Landry, III
15th Judicial District Attorney's Office
P.O. Box 3306
Lafayette, LA   70506
(337) 232-5170
COUNSEL FOR APPELLEE:
    State of Louisiana


Carey J. Ellis, III
Louisiana Appellate Project
P.O. Box 719
Rayville, LA  71269
(318) 728-2043
COUNSEL FOR APPELLANT:
    Darrel G. LeDee a/k/a Shane Allen Henry

**COOKS, Judge.**

On appeal, Defendant contends the trial court erred in failing to suppress his confession. For the following reasons, we affirm with instructions.

**FACTS**

While armed with a gun, the Defendant, Darrel G. Ledee a/k/a Shane Allen Henry, allegedly robbed an employee of BJ's Pizza on October 13, 2001 and an employee of Papa John's Pizza on October 19, 2001.

Defendant was charged by bill of information with two counts of armed robbery, in violation of La.R.S. 14:64, and two counts of aggravated kidnapping, in violation of La.R.S. 14:44. Defendant entered a plea of not guilty. A Motion to Suppress Confession was filed and subsequently denied after a hearing. Defendant entered a *Crosby* plea to two counts of armed robbery and the State dismissed the two counts of aggravated kidnapping. By entering a *Crosby* plea, Defendant reserved his right to appeal the denial of his Motion to Suppress Confession. In accordance with the State's recommendation, Defendant was sentenced on each count to twenty years at hard labor without benefit of probation, parole or suspension of sentence, each count to run concurrently. On appeal, Defendant asserts the trial court erred in failing to suppress his confession.

**ASSIGNMENTS OF ERROR**

In the brief filed by Defendants' counsel, he contends the trial court erred in failing to suppress his confession. He specifically argues Defendant requested an attorney during his interview with police and that the police promised to go to the District Attorney in order to secure him a twenty-year sentence, with ten years suspended, and drug rehabilitation. In Defendant's *pro se* brief, in assignments of error, one, two, three, and four, he contends the trial court erred in failing to suppress

-1-

his confession, that he was denied his right to a fair trial, that false statements were made to him concerning the denial of his constitutional rights, and that his rights were violated.

> As a general matter, before a confession may be admitted into evidence, the State has the burden of affirmatively showing it was made freely and voluntarily, and not under the influence of fear, duress, intimidation, menace, threats, inducements, or promises. LA.REV.STAT. ANN. § 15:451; *State v. West*, 408 So.2d 1302, 1307 (La.1982); *State v. Dewey*, 408 So.2d 1255, 1258 (La.1982). Furthermore, if the statement was made during custodial interrogation, the State must show the defendant was advised of (and waived) his constitutional rights. *Miranda v. Arizona*, 384 U.S. 436 (1966); *State v. Petterway*, 403 So.2d 1157, 1159 (La.1981); *State v. Sonnier*, 379 So.2d 1336, 1355 (La.1979). Once a suspect in custody expresses a desire, at any stage in the process, to deal with the police only through counsel, all questioning must cease and the accused may not be subject to further interrogation until counsel has been made available to him, unless he initiates further communication, exchanges or conversation with the police, and validly waives his earlier request for counsel. *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981); *Miranda*, 384 U.S. at 440-45.

*State v. Manning*, 03-1982, p. 14  (La. 10/19/04), 885 So.2d 1044, 1066-67.

"A trial judge's ruling on whether or not a statement is voluntary is given great weight and will not be disturbed on appeal unless clearly unsupported by the evidence. *State v. Thornton*, 351 So.2d 480, 484 (La.1977)." *State v. Vinge*, 01-2940, p. 6 (La. 6/21/02), 820 So.2d 533, 537.

Chief Kendal Gibson, a former detective for the Lafayette Police Department, traveled to St. Landry Parish to interview the Defendant on November 5, 2001. Chief Gibson testified, before interviewing Defendant, he completed the advice of rights form and read it to Defendant. According to Chief Gibson, Defendant signed the form in his presence and at no time did Defendant communicate that he did not understand his rights or did not want to talk. Chief Gibson further testified Defendant did not ask for an attorney nor seek to terminate the interview. Additionally, when asked if he was under the influence of any drugs or medication, Defendant indicated

-2-

he was not.  Chief Gibson also related he made no promises to Defendant, but noted the Defendant did inquire about assistance with his drug problem.  Chief Gibson acknowledged that he informed Defendant he would make the District Attorney's Office aware of his cooperation in the investigation.

The following exchange occurred during cross-examination regarding Defendant's alleged request for an attorney:

> Q    Okay.  During the course of talking about that and your investigation and whether he'd be willing to give a statement and talking to him about his rights, did Mr. Ledee ever make any statement to you about or inquire with you as to whether he should get an attorney?
>
> A    I don't recall.  But when someone asks me if they have -- if they want an attorney, the interview stops right there.  I don't proceed with an interview.
>
> Q    That's your standard procedure in all criminal matters?
>
> A    If someone tells me they want an attorney, I do not begin asking questions until that attorney's been contacted or until they've had an opportunity to speak.
>
> Q    Well, what if they don't tell you I want an attorney.  What if they just say: I wonder if I should get an attorney, or do you think I should get an attorney?  How do you handle that?
>
> A    I can't recall in this incident if I was asked that.  But I can tell you if someone has asked me that before, I've told them it's their decision to make if they want an attorney present while this questioning is going on.
> Q    Okay.  And do you recall if Darrel Ledee made any such statements or inquiries in this case?
>
> A    No, sir.  I don't recall it, and I would not have proceeded if he would have asked for an attorney.

Chief Gibson also testified he did not recall telling Defendant that he would try to help him if he gave a statement or that he discussed sentencing with Defendant. The following exchange occurred regarding sentencing and assistance from the District Attorney's Office:

> Q    Okay.  And more specifically do you recall telling him that you

would try to, for lack of a better term, lobby with the DA for a sentence of twenty years with ten suspended and drug rehabilitation --

A      First of all, sir, I don't have a position to be able to make that kind of a deal with him.

Secondly, the only thing I recall about the DA was that I -- at the end of our statement was that I would advise them that he did cooperate with the investigation.

. . . .

Q      Okay.  Getting back to my specific question, did you indicate to Darrel Ledee that you would do that, that you would put in a good word for him with the DA and recommend to the DA, for lack of a better term, or lobby to the DA for a sentence of twenty years with ten suspended and drug rehabilitation?

A      Sir, I have never offered a single person in my career what time limit they would do or anything of that nature.

Q      I'm not asking you if you offered it.  I'm just asking if Darrel tells me that you said you would try to see if you could get him that or that you would just talk to the DA and maybe recommend that particular sentence do you recall having that conversation with Darrel Ledee?

A      No, sir.  I do not.

Detective Craig Ortego testified that he remembered Chief Gibson interviewing Defendant at the St. Landry Parish Sheriff's Department.  Defendant asked Detective Ortego if he knew the officers who were about to interview him, and Detective Ortego testified he told Defendant that Chief Gibson was a good man.  When Detective Ortego spoke with Defendant, no mention of an attorney was made and no discussion of his rights occurred.  The following exchange occurred regarding promises made by the officers interviewing the Defendant:

Q      Did -- in the context of this discussion about whether Darrel could trust these guys, did Darrel indicate that they had made any promises to him, or that they had said they would help him out, and so he was wondering whether he could believe what they were saying?

A      I don't recall.  I know there was no promises.  I know he didn't mention that to me at all.  Now whether they would talk to the DA for him to try to help him with any problem that could have come up, but I

-4-

don't recall it.

Q      Okay. So you have a vague recollection that there may have been some statements that they would try to help him?

A      Yes, sir.

Q      But you don't know of any promises or any specific results, I think, is what you're saying? You don't know any promises or specific results --

A      Right.

Q      -- to your knowledge that were made?

A      Right.

On cross-examination, Detective Ortego again testified he did not hear any promises made to Defendant. Detective Ortego did not believe Defendant was under the influence of alcohol or drugs.

Defendant testified he met with Chief Gibson and Detective Morgan, informing the officers that he knew nothing about any armed robberies that occurred in Lafayette. Additionally, Defendant testified he did not want to speak to the officers who interviewed him and that during the interview he requested an attorney. Defendant stated when he requested an attorney he was told "no."

Defendant testified about his conversation with Detective Ortego as follows:

But when I walked out of the room, I knew, you know, Detective Craig Ortego, and he was already helping me on my charges that I had out there, and he asked me what was wrong.

I told him, I say, "They made promises to me." The detective told me -- he even wrote it down -- he said I could go -- I say, "If I confess to y'all," I say, "what type of -- y'all going to help me out? Y'all -- what type of deal y'all going give me?"

He say, "Well, look, I can go to the District Attorney's Office when -- the DA when I leave from here, and I can recommend him giving you a twenty year sentence and suspend ten and ask him to -- you know, when you finish those ten years for you to, you know, go to drug rehab."

He say, "You look small anyway. All you got to do is just tell them you was on drugs."

So I say, "Fine." But I walked out. I was still, you know, mad because I knew that something seemed funny.

So -- but when I walked out, Craig asked me, he say, "What's wrong?"

I say, "Man, they're trying to make me cooperate with them and give them some confessions, you know, to the crime I ain't commit."

He said -- I said -- he said, "Well, what type of promises they made to me?'

And I told him about the drug rehab and getting me some help, you know, with the District Attorney. And he even told me he was going to go to the District Attorney as soon as he leave, you know, from interrogating me when he get back in Lafayette.

So Craig told me, he say, "Darrel, cooperate with them." He say, "Which one told you that?"

And I pointed to him.

He say, "I know that guy personally." He say, "I've been knowing him all my life." He say, "I told"--

. . . .

He said, "If he told you he going to help you out -- if he told you he going to help you out, if he made some promises to you," he said -- he told me, he said, "he going to do it; he going to help you." He said, "Just cooperate with him. I told them how you was in enough trouble with us, and we was trying to help you, and I know you from -- you know, when you was a child."

He say, "The man told me that he was going to help you, and he going to help you."

. . . .

And when I went back in there is because Detective Craig Ortego told me he was going to help me, and I trusted him because when I used to, you know, run away from home when I was a child, you know, he would help me, you know, and he would -- you know, come get me every time I called him.

So I believe he was going to help me. I believe that, you know, the man was going to go to the District Attorney and talk to him for me,

you know, and get me a light sentence or help me out, you know, if I cooperate; that's why I did that.

The Defendant also testified he told Detective Ortego he asked for an attorney and when he went back into the room after speaking to Detective Ortego he again requested an attorney. Defendant later testified had he known the officers could not get the deal they promised him, he would not have confessed.

On cross-examination, Defendant was questioned about the advice of rights form he executed. Defendant stated he twice refused to sign the form and did not sign it until after he spoke with Detective Ortego. He indicated, at the time the form was signed, he was aware of his right to an attorney. Defendant testified that he did not feel he needed an attorney after the promises made to him by the officers.

A review of the transcript of Defendant's taped statement reveals the following exchange occurred:

Chief Gibson: You and I were speaking before this that you were trying to get something out of this by coming forward and saying look I made a mistake and what do you want to do I mean you made a comment about wanting to get help.

Defendant: Get help. Some, I know some probably time could have summoned the drug rehab cause I'm young I want to get my life together. You know I know I made a mistake that's why I'm cooperating with y'all cause y'all say y'all might be able to help me, I know y'all could go to the D.A. and see what he'll do for me. So I don't want to spend the rest of my life behind bars. I know I made a mistake and you know I want to do something with my life.

Chief Gibson: So the best thing you're hoping right here not to get something real harsh that's gonna hammer you for a long period of time to where you can get some help.

Defendant: Cause if I get a lot of time I'm gonna tell you the way I'm feeling now. I'm gonna kill myself bra.

Chief Gibson: Okay. So you're looking for some help in the D.A.'s, to get A-your addiction wiped out as far as hospitalization.[]

Defendant: Yeah.

Chief Gibson: . . . whatever is needed and hopefully not go get a long sentence.[]

Defendant: Yeah.

Chief Gibson: . . . to where you can get on with your life being that you're twenty six years old.

Defendant: Yeah.

The Defendant testified he mentioned the District Attorney's Office and drug rehab in his statement so if the officers tricked him the information would be in his statement.

Chief Gibson was recalled by the State and testified that he did tell the Defendant he was welcome to make a comment during his statement that the officers would mention his cooperation to the District Attorney's Office. However, Detective Gibson testified that at no time during the interview were any deals or guarantees made. Detective Gibson further maintained he did not discuss the length of sentencing with Defendant. He did recall, however, discussing the fact that Defendant had a drug addiction. Detective Gibson indicated he did not have a discussion with the District Attorney's Office regarding the Defendant, but all information about the Defendant's addiction was in the statement given to the District Attorney's Office.

Defendant signed a waiver of rights form and confessed to police. In argument to this court, the Defendant alleges he requested an attorney and that police made promises regarding his sentence. In his *pro se* brief, the Defendant argues that he would not have given the statement if he was not influenced and persuaded by Detective Ortego; therefore, the statement was obtained by psychological coercion. Defendant also contends that because the detectives did not go to the District Attorney's Office and use their influence to procure a light sentence for him, he was

denied a fair trial. Additionally, Defendant alleges his statement was not voluntary and was given under duress when detectives intentionally misrepresented facts or lied in order to scare him. Lastly, Defendant alleges he was told by detectives that he was visible on a videotape from a bank.

Upon a review of the record, we find Defendant's testimony conflicts with that of both Chief Gibson and Detective Ortego. Both officers testified Defendant did not mention an attorney. Additionally, Chief Gibson testified Defendant mentioned a reduced sentence during the interview; however, Chief Gibson did not promise that he would go to the District Attorney's Office on behalf of Defendant. Based on the conflicting testimony of the officers and the Defendant, we find the trial court made a credibility determination and chose to believe the testimony of the officers. We cannot say the trial court's ruling was unsupported by the evidence. Additionally, there is no evidence in the record to support the Defendant's assertion that Detective Ortego used psychological intimidation to influence him to give a statement. Defendant was not denied the right to a fair trial; he voluntarily entered a plea of guilty in this matter. Accordingly, these assignments lack merit.

### PRO SE ASSIGNMENT OF ERROR NO. 5

In his fifth *pro se* assignment of error, Defendant contends the lower court violated the rules of this court and his rights by not handing over transcripts. The Defendant alleges that the District Attorney and/or the trial court never filed the transcript of the motion to suppress hearing with this court.

We find any error regarding the filing of the transcript of the motion to suppress hearing is moot because the transcript was available to Defendant's attorney prior to briefing and this court at the time Defendant's appeal was reviewed.

**ERRORS PATENT**

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent on the face of the record. After reviewing the record, we find one error patent and an error in the minutes of sentencing.

Defendant was improperly advised that he had two years from the date of sentencing to file an application for post-conviction relief. Both the guilty plea form and the sentencing transcript indicate the Defendant was informed that he had two years from "today" to file post- conviction relief. Under La.Code Crim.P. art. 930.8, the Defendant has two years after the judgment of conviction and sentence have become final to apply for post-conviction relief. Thus, the trial court is directed to inform Defendant of the correct provisions of article 930.8 by sending appropriate written notice to him within ten days of the rendition of this opinion and to file written proof that Defendant received the notice in the record of the proceedings.

Additionally, both the minutes of sentencing and the letter of commitment fail to correctly reflect the sentences imposed. According to the sentencing transcript, the trial court sentenced Defendant *on each count* of armed robbery to twenty years at hard labor, without benefit of parole, probation or suspension of sentence, and ordered the sentences to run *"concurrent with one another."* The minutes of sentencing and the letter of commitment, however, indicate that only one sentence of twenty years was imposed, to run concurrent with any other sentence the Defendant was serving. Thus, the trial court is instructed to amend the minutes of sentencing as well as issue a new letter of commitment correctly reflecting the sentences imposed.

**DECREE**

For the foregoing reasons, Defendant's convictions are affirmed. The trial court is directed to inform the Defendant of the correct provisions of article 930.8 by

sending appropriate written notice to the Defendant within ten days of the rendition of this opinion and to file written proof that the Defendant received the notice in the record of the proceedings. The trial court is also instructed to amend the minutes of sentencing as well as issue a new letter of commitment reflecting that twenty-year sentences were imposed on each count of armed robbery and were ordered to run concurrent with each other.

**AFFIRMED WITH INSTRUCTIONS.**