DREW, J.
| T Walter V. Walker entered a Crosby[1] plea, reserving his right to appeal the trial court’s denial of both his motion to suppress his confession and his motion to change venue of the trial. He was sentenced to two mandatory terms of life imprisonment, to be served concurrently. He appeals. We affirm.
FACTS
On June 15, 2011, Jasmine Smith was murdered. The next day Nakesha Washington was murdered. Each had her throat cut and was stabbed and beaten. The crimes occurred in Tallulah. On June 17, 2011, the defendant’s mother found his bloody clothing, which she gave to the police.
In short order, the defendant was interviewed at Riverbend Detention Center, where he was advised of his Miranda rights.[2] The interrogation was roughly divided into three sessions over several hours. The defendant ultimately confessed to the killings and agreed to provide a videotaped statement. At 8:48 p.m., the final videotaped confession began, concluding 45 minutes later.[3] The defendant was explained his rights on multiple occasions during the questioning. He clearly was *583 aware of, understood, and waived his rights.
The defendant’s pretrial motions were heard and denied on October 26, 2012. Two Louisiana State Police Detectives testified.
^Detective Neal Harwell testified that:
• he has 20 years of law enforcement experience;
• the defendant was not under arrest and not handcuffed during questioning;
• Trooper Brown advised the defendant of his Miranda rights;
• the defendant signed the waiver of rights form as did the troopers;
• the defendant’s demeanor was normal, and he appeared to know his rights;
• the defendant was under no duress, and his speech was not slurred;
• the defendant did not seem to be under the influence of drugs or alcohol;
• the interrogation lasted five or six hours, with ample breaks;
• any time the defendant asked for a break, he was granted a respite;
• at no time during questioning did the defendant request to leave;
• during initial questioning,[4] the defendant did not want to be recorded and denied any involvement in the murders;
• when the defendant was advised that his clothing had been seized, he admitted to being present at both murder scenes;[5]
• the defendant admitted witnessing the killing of Nakesha from the bushes and, when her assailants left the scene, he lifted her face to see if she was breathing and got blood on his pants;
• the defendant said he “stumbled” on the fence line and fell on Jasmine’s body, which explains the presence of Jasmine’s blood on his pants;
*they then broke for dinner, with the troopers urging him to tell the truth; • the defendant then confessed to the killings;[6]
|⅞* the defendant was never under duress
or threatened; and
• there were no inducements or intimidation.
Trooper Scott Brown testified that:
• he was involved in the investigation from the outset;
• he was the officer initially contacted by the defendant’s mother;
• she gave him her son’s bloody clothing;
• she said that when she confronted her son, he told her that he had been trying to hide a dead body;
• the defendant was alert and answered the questions appropriately;
• at no time did the defendant ask to stop, leave or request an attorney;
• the defendant was not threatened, coerced or intimated;
• the interrogation was actually one long session, with various breaks;
• for clarity, he referred to each story as statements one, two and three;
• the defendant was allowed a cigarette after dinner;
• the audio recorder was started at 6:05 p.m., after 80 minutes of questioning;
• the video statement began at 8:48 p.m. and ended at 9:33 p.m.;
• the defendant signed the rights waiver at 3:44 p.m.; and
• the defendant initialed the rights waiver at 6:33 p.m.
*584 The defendant also testified, stating that:
• the officers began the questioning with, “We got you hah, murderer”;
• the officers told him he had no rights and was not entitled to a lawyer;
• he was told to cooperate or there was a “team of State Police standing outside the door, waiting on the green light”;
• his children were used as a tool to get him to talk; and
• he gave the confession to protect his children.
|,,On cross-examination, the defendant admitted to signing and then initialing the waiver of rights form.[7] Following the testimony, the trial judge credited the testimony of the officers and, under the totality of the circumstances, found that the state had met its burden of proof that the statement was freely and voluntarily given. The defendant’s confession is chilling and brutally graphic.[8]
The police were able to get cell phone records indicating that the defendant and the victims talked immediately prior to the murders.
1 ¡¿DISCUSSION

Motion to Suppress Confession

Defendant complains that he did not understand his Miranda rights or have the ability to comprehend his actions. He asserted that he did not knowingly, intelligently, and voluntarily waive his rights prior to giving the confession. On appeal, he argues that his confession was the product of fear, duress, intimidation, menaces, threats, inducements and/or promises.
The state counters that the defendant was fully aware of, understood, and voluntarily waived his rights. He was advised of his rights on at least three occasions during questioning and clearly stated that he understood them. The state urges that there was no duress, threats, or intimidation, and officers were amenable to the defendant’s needs and requests during the *585 questioning, including bathroom breaks, food, beverages, and a cigarette.
Our law on appellate review of contested confessions is well settled.[9]
|fiThe trial court was correct to conclude that defendant’s statements, including his confession, were freely and voluntary made. Twice on the video, the defendant is re-advised of his rights. He begins reciting the events as they occurred and appears relieved to be doing so. He is brought dinner during the confession, and he eats. He is allowed to smoke. There is no coercion.
The defendant emphasizes that:
• the officers worked in shifts on him;
• they played on his concern for his family;
• he has only a sixth grade education;
• he was hungry, tired, scared, wanted to smoke, and see his family;
• the officers used all of these emotions to coerce a confession from him.
None of these accusations are borne out by the testimony of the troopers or by a review of the DVD. The defendant told the officers that he had completed his GED and had no difficulty reading and writing. He was provided food, beverages, breaks when requested, and was assured he would see his family. Once dinner was finished, he was provided a cigarette |7to smoke. The totality of this record displays a free and voluntarily decision to confess. The trial court did not abuse its great discre *586 tion in finding that the state met its burden of proof.

Motion for Change of Venue

The defendant argues that the large amount of publicity surrounding the crimes made it impossible for him to receive a fair trial in Madison Parish. In an effort to gain information about the general public’s knowledge and perception of the ease and the defendant, the trial court ordered a mock jury venire consisting of 30 potential jurors to be summoned for the change of venue motion hearing. Of the 30 summoned, 11 potential jurors presented, one of whom was not questioned on the record.. The remaining 10 potential jurors were questioned in a mock voir dire setting. Four of the jurors either knew, or knew of, the defendant. Two of the jurors knew the victims, but not the defendant. Three did not know either the defendant or the victims. Only two of the jurors had no knowledge of the case or the defendant. However, each of the jurors, including a former teacher of the defendant, stated that while they had heard of the case in the news, they would be able to follow the law and be impartial. The 10th juror was the defendant’s uncle, who expressed his belief that the defendant was guilty and, thus, he was not questioned extensively.
Our law on appellate review of change of venue matters is well settled.[10]
*587 ^Application of the Bell factors to the instant case reveals that the trial court was well within its discretion in denying the motion to change venue. State v. Bell, 315 So.2d 307 (La.1975). This record provides no proof of salacious headlines or a witch hunt mentality in the parish.
IsiThe only evidence of any public awareness is found in the answers of several of the 10 potential jurors questioned in the mock voir dire. Several jurors knew of the case through the media, but did not know details and had no opinion. Those who did know the defendant or the victims all indicated that they could follow the law and be impartial. Simply put, there was' insufficient evidence presented as to the nature and scope of the publicity of which the defendant complains. State v. Magee, 2011-0574 (La.9/28/12), 103 So.3d 285. Each member of the mock jury venire indicated he or she could follow the law and be impartial. Id. The defendant did not show that he had an inability to receive a fair trial in Madison Parish.
DECREE
The convictions and sentences of the defendant are AFFIRMED.

. State v. Crosby, 338 So.2d 584 (La.1976).

. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

.There was first an unrecorded statement of denial, and then one videotaped statement before the video confession which is sought to be suppressed.

. Referenced as the "First statement.”

. Referenced as the "Second statement.”

. Referenced as the "Third statement.”

. The following exchange took place:
Q: Did they go through this form as indicated on the video, as you’ve seen?
A: Yes, ma'am.
Q: And one of the questions on this form says that you have a right to have an attorney present.
A: Yes, ma’am.
Q: And you initialed that you
A: Right.
Q: Understood that, right?
A: Right.
Q: Do you have any problems with reading or understanding what you are reading?
A: No, ma’am. No, ma’am.

. This factual scenario is taken from the defendant's confession:
On June 15, 2011, the defendant, Jasmine and Nakesha were in the park smoking marijuana and were planning to have sex. The defendant and Jasmine engaged in sexual intercourse and he and Nakesha were to have sex next. However, an altercation occurred between Jasmine and Nakesha at which point Jasmine pulled a knife. Nakesha grabbed it and cut Jasmine. Nakesha then looked at him like she did not know what to do next as Jasmine was pleading with them to help her. The defendant took the knife, cut Jasmine’s throat, and stabbed her in the neck. He and Nakesha hid Jasmine’s body after stomping on her back, head and face. The two walked away and he went to his mother’s house and changed clothes.
The next day, he and Nakesha were playing cards. She told him that she was nervous about Jasmine’s death and thought she might need to talk to someone about it. They walked to the fairgrounds and had sex. He used the same knife to cut Nakesha's throat and then stomped her until she was unresponsive. He hid the knife, walked to his mother's home, and removed his bloody shorts, which he placed with the pants stained with Jasmine’s blood.

. Louisiana Code of Evidence Article 703 provides, in part:
[[Image here]]
B. A defendant may move on any constitutional ground to suppress a confession or statement of any nature made by the defendant.
[[Image here]]
D. On the trial of a motion to suppress filed under the provisions of this Article, the burden of proof is on the defendant to prove the ground of his motion, except that the state shall have the burden of proving the admissibility of a purported confession or statement by the defendant or of any evidence seized without a warrant.
At a hearing on a motion to suppress a confession, the state bears the burden of proving beyond a reasonable doubt the free and voluntary nature of the confession. State v. Hills, 354 So.2d 186 (La. 1977); State v. Collier, 39,650 (La.App.2d Cir.7/27/05), 909 So.2d 23, writ denied, 2006-0308 (La.9/1/06), 936 So.2d 196; State v. Collier, 34,774 (La.App.2d Cir.6/20/01), 792 So.2d 793, writ denied, 2001-2199 (La.6/7/02), 817 So.2d 1142.
Before what purports to be a confession can be introduced into evidence, the state must affirmatively prove that it was free and voluntary and not made under the influence of fear, duress, intimidation, menaces, threats, inducements or promises. La. R.S. 15:451. The state must also establish that an accused who makes a statement during custodial interrogation was first advised of his or her Miranda rights. State v. Callier, supra; State v. Collier, supra; State v. Walker, 28,577 (La.App.2d Cir. 10/4/96), 681 So.2d 1023.
Interrogation is "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.” Miranda v. Arizona, supra. Interrogation includes words or actions on the part of the police that the police should know are reasonably likely to elicit an incriminating response from the suspect. Rhode Island v. Innis, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980); State v. Callier, supra.
The trial court is afforded great discretion in ruling on a motion to suppress, and its ruling will not be disturbed absent an abuse of that discretion. State v. Lee, 2005-2098 (La. 1/16/08), 976 So.2d 109, cert, denied, 555 U.S. 824, 129 S.Ct. 143, 172 L.Ed.2d 39 (2008). Likewise, a trial judge’s ruling on whether or not a statement is voluntary is given great weight and will not be disturbed on appeal unless clearly unsupported by the evidence. State v. Vigne, 2001-2940 (La.6/21/02), 820 So.2d 533. Great weight is placed upon the trial court’s ruling on a motion to suppress because it had the opportunity to observe the witnesses and weigh the credibility of their testimony. State v. Williams, 46,842 (La.App.2d Cir.3/14/12), 87 So.3d 949; State v. Crews, 28,153 (La.App.2d Cir.5/8/96), 674 So.2d 1082.

. Changes of venue are governed by La. C. Cr. P. art. 622, which provides:
A change of venue shall be granted when the applicant proves that by reason of prejudice existing in the public mind or because of undue influence, or that for, any other reason, a fair and impartial trial cannot be obtained in the parish where the prosecution is pending. In deciding whether to grant a change of venue the court shall consider whether the prejudice, the influence, or the other reasons are such that they will affect the answers of jurors on the voir dire examination or the testimony of witnesses at the trial.
The most recent discussion of the law on changes of venue in criminal matters is found in the supreme court opinion in State v. Ma-gee, 2011-0574 (La.9/28/12), 103 So.3d 285: In exceptional circumstances, prejudice against a defendant may be presumed. Otherwise, it is the defendant’s burden to demonstrate actual prejudice. To meet this burden, a defendant must prove more than mere public general knowledge or familiarity with the facts of the case: he must demonstrate the extent of prejudice in the minds of the community as a result of such knowledge or exposure to the case. A defendant is not entitled to a jury entirely ignorant of his case and cannot prevail on a motion for change of venue simply by showing a general level of public awareness about the crime; rather, he must show that there exists such prejudice in the collective mind of the community that a fair trial is impossible. Whether a defendant has made the requisite showing of actual prejudice is a question addressed to the district court's sound discretion which will not be disturbed on appeal absent an affirmative showing of error and abuse of discretion.
In State v. Bell, 315 So.2d 307 (La. 1975), the court enumerated several factors relevant to the district court’s determination of whether to order a change of venue. These factors include: (1) the nature of pretrial publicity and the degree to which it has circulated in the community; (2) the connection of government officials with the release of the publicity; (3) the length of time between the dissemination of the publicity and the trial; (4) the severity and notoriety of the offense; (5) the area from which the jury is to be drawn; (6) other events occurring in the community which either affect or reflect the attitude of the community or individual jurors toward the defendant; and (7) any factors likely to affect the candor and veracity of the prospective jurors on voir dire. In setting out these factors, this court emphasized that in deciding whether to change venue, the district court must extend its focus beyond the prejudices and attitudes of individual venire persons. The defendant must be allowed to show that, even if it would be possible to select a jury whose members were not subject to a challenge for cause, prejudice or influences exist within the community at large that would affect the jurors’ answers during voir dire or the witnesses' testimony, or that for any other reason, a fair and impartial trial *587 could not be obtained in that venue. The district court's ultimate determination must rest on the community's attitude toward the defendant.
In reviewing a denial of change in venue, the primary task of the court is to inquire as to the nature and scope of publicity to which prospective jurors in a community have been exposed and examine the lengths to which a court must go to impanel a jury that appears to be impartial in order to ascertain whether prejudice existed in the minds of the public which prevented the defendant from receiving a fair trial. In performing this review, courts must distinguish largely factual publicity from that which is invidious or inflammatory, as the two present real differences in the potential for prejudice. While, ultimately, there is no bright line test for ascertaining the degree of prejudice existing in the collective mind of the community, the seven Bell factors help facilitate the inquiry.