NOT DESIGNATED FOR PUBLICATION

STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

15-817

STATE OF LOUISIANA

VERSUS

RAY DELOACH AKA RAY A. DELOACH

**********

APPEAL FROM THE
THIRTY-THIRD JUDICIAL DISTRICT COURT
PARISH OF ALLEN, NO. 2013-0635
HONORABLE JOEL G. DAVIS, DISTRICT JUDGE

**********

PHYLLIS M. KEATY
JUDGE

**********

Court composed of Marc T. Amy, Phyllis M. Keaty, and John E. Conery, Judges.

AFFIRMED.

**Edward J. Marquet**
**Louisiana Appellate Project**
**Post Office Box 53733**
**Lafayette, Louisiana 70505-3733**
**(337) 237-6841**
**Counsel for Defendant/Appellant:**
**Ray Deloach**

**H. Todd Nesom**
**District Attorney**
**Joe Green**
**Steven Sumbler**
**Assistant District Attorneys**
**Post Office Box 839**
**Oberlin, Louisiana 70655**
**(337) 639-2641**
**Counsel for Appellee:**
**State of Louisiana**

**KEATY, Judge.**

After a jury trial, Defendant, Ray Deloach, was found guilty as charged on five counts of aggravated rape of a juvenile under the age of thirteen and two counts of sexual battery. The victim was the nine-year-old daughter of Defendant's then girlfriend. He was sentenced to five terms of life imprisonment without the benefit of probation, parole, or suspension of sentence for the convictions of aggravated rape and two terms of fifty years imprisonment on each of the counts of sexual battery, with the first twenty-five years to be served without the benefit of probation, parole, or suspension of sentence. All of the sentences were ordered to be served concurrently. Defendant appeals alleging that the trial court erred in denying his motion to suppress his confession and in allowing the State to introduce other crimes evidence. For the following reasons, we affirm Defendant's convictions and sentences.

## DISCUSSION

Defendant was indicted on February 8, 2013, on five counts of aggravated rape of a juvenile under the age of thirteen, violations of La.R.S. 14:42, and two counts of sexual battery, violations of La.R.S. 14:43.1. Defendant filed a "Motion to Suppress Statements," which the trial court denied after a contradictory hearing. Later, the State filed a "Notice of Intent to Use Evidence of Other Crimes" which the trial court granted. Trial by jury commenced on April 21, 2015, and on April 23, 2015, Defendant was found guilty as charged on all counts.

Defendant timely filed a "Motion for Judgment of Acquittal" and a "Motion for New Trial." The motions were denied on June 30, 2015, following which the trial court sentenced Defendant to five terms of life imprisonment without the benefit of probation, parole, or suspension of sentence, for the convictions of

aggravated rape and two terms of fifty years imprisonment on each of the counts of sexual battery, with the first twenty-five years to be served without the benefit of probation, parole, or suspension of sentence. All the sentences were ordered to be served concurrently.

## *The Motion to Suppress*

In his first assignment of error, Defendant asserts that the trial court should have granted his motion to suppress. Defendant denies that he committed the charged offenses and asserts that he only confessed because Deputy Brian Frost threatened to kill him if he did not do so.

> In considering the admissibility of a statement, it is well settled that the State must bear the burden of demonstrating a defendant's knowing and intelligent waiver of his or her privilege against self-incrimination and the right to counsel. *State v. Vigne*, 01-2940 (La.6/21/02), 820 So.2d 533, quoting, *Tague v. Louisiana,* 444 U.S. 469, 100 S.Ct. 652, 62 L.Ed.2d 622 (1980). Furthermore, La.R.S. 15:451 specifically states that before a confession can be introduced, "it must be affirmatively shown that it was free and voluntary, and not made under the influence of fear, duress, intimidation, menaces, threats, inducements or promises." A trial court's determination regarding the admissibility of a statement is to be given great weight and will not be disturbed by a reviewing court unless it is clearly unsupported by the evidence. *Vigne*, 820 So.2d 533.

*State v. Chesson*, 03-606, p. 7 (La.App. 3 Cir. 10/1/03), 856 So.2d 166, 173, *writ denied*, 03-2913 (La. 2/13/04), 867 So.2d 686.

Furthermore, in *State v. Roshell*, 40,374, pp. 6-7 (La.App. 2 Cir. 12/14/05), 916 So.2d 1268, 1272, *writ denied,* 06-771 (La. 10/6/06), 938 So.2d 69, the court stated:

> The state must also affirmatively prove that the defendant was first advised of his Miranda rights and that the confession was not made under the influence of fear, duress, intimidation, menaces, threats, inducements, or promises. *State v. Johnson*, 36,014 (La.App.2d Cir.6/12/02), 821 So.2d 652. The testimony of the interviewing police officer alone may be sufficient to prove the defendant's statement was given freely and voluntarily. *State v. Trotter,* 37,325 (La.App.2d

Cir.8/22/03), 852 So.2d 1247, *writ denied,* 2003-2764 (La.2/13/04), 867 So.2d 689, *recon. denied,* 2003-2764 (La.4/23/04), 870 So.2d 282; *State v. Henderson,* 31,986 (La.App.2d Cir.8/18/99), 740 So.2d 240.

In *State v. Jackson,* 381 So.2d 485 (La.1980), and *State v. Morvant,* 384 So.2d 765 (La.1980), the Louisiana Supreme Court stated the principles under which the admissibility of a confession must be judged. As a matter of federal constitutional law, a confession obtained by any direct or implied promises, however slight, or by the exertion of any improper influence, must be considered involuntary and inadmissible. *See Bram v. United States,* 168 U.S. 532, 18 S.Ct. 183, 42 L.Ed. 568 (1897) *and State v. Roddy,* 33,112 (La.App.2d Cir.4/7/00), 756 So.2d 1272, *writ denied,* 2000-1427 (La.5/11/01), 791 So.2d 1288.

The admissibility of a confession is a question for the trial court, whose conclusions on the credibility and weight of testimony relating to the voluntary nature of the confession will not be overturned on appeal unless not supported by the evidence. *State v. Coleman,* [32,906 (La.App. 2 Cir. 4/5/00), 756 So.2d 1218, *writ denied,* 00-1572 (La. 3/23/01), 787 So.2d 1010]; *State v. Thibodeaux,* 98-1673 (La.9/8/99), 750 So.2d 916, *cert. denied,* 529 U.S. 1112, 120 S.Ct. 1969, 146 L.Ed.2d 800 (2000). Because the trial court has the opportunity to observe the witnesses and assess their credibility, we place great weight on its factual determinations. *State v. Crews,* 28,153 (La.App.2d Cir.5/8/96), 674 So.2d 1082.

While the state has the burden of proving the admissibility of the confession in a trial on a motion to suppress, the defendant has the burden of proving the ground of his motion. La.C.Cr.P. art. 703(D).

Sergeant Joshua Runge, with the Oakdale Police Department, was the first witness to testify at the hearing on Defendant's motion to suppress. He stated that on September 26, 2012, he received a notification from the Oakdale Community Hospital regarding a molestation complaint. Sergeant Runge went to the hospital, where he spoke with the victim's mother and set up an appointment for the victim to be examined by the SANE (Sexual Assault Nurse Examiner) nurse. After the victim named Defendant as the perpetrator, Sergeant Runge spoke to Defendant, who was at his mother's home, and arranged for Officer Charles Cotten to bring him to the police station. At the station, Sergeant Runge read Defendant his

*Miranda* rights before interviewing him. Defendant explained that he and his former girlfriend, the victim's mother, had recently split up. While he initially denied having engaged in any type of sexual misconduct with the victim, when confronted with the victim's claim that he had used a sex toy with her, Defendant admitted that he kept a sex toy in a bathroom drawer in his former girlfriend's house.

Sergeant Runge advised Defendant to remain in Oakdale in case he needed to question him further, and Defendant stated that he was not planning to go anywhere. After receiving the SANE nurse's report, which revealed that the victim had trauma to the vaginal area which supported her allegation of sexual assault, Sergeant Runge called Defendant and asked him to return to the police station. Although Defendant told him that he was driving to Lafayette but would return to Oakdale the next day, Sergeant Runge was notified that Defendant may have actually gone to Beaumont, Texas. After obtaining an arrest warrant for Defendant, Sergeant Runge learned that the Beaumont police had picked up Defendant and was holding him for extradition. According to Sergeant Runge, the Oakdale Police Department was shorthanded, so he contacted Deputy Brian Frost, who volunteered to retrieve Defendant and bring him back to Oakdale. Sergeant Runge stated that Deputy Frost texted him while en route to Oakdale giving him their estimated time of arrival and saying that he was not speaking to Defendant, who was "passed out." According to Sergeant Runge, he was prepared to confront Defendant with the new evidence he had obtained since they first spoke, and he would have been "very upset" if Deputy Frost had disclosed any of that information to Defendant before he arrived back in Oakdale.

4

Sergeant Runge testified that no words were spoken between Defendant and Deputy Frost when they arrived at the station on October 2, 2012. At that time, Defendant did not appear to be injured in any way and he did not complain of having sustained any injuries. Sergeant Runge stated that he, Deputy Frost, and Officer Cotten were present when Defendant was read his *Miranda* rights before being questioned by Deputy Frost. Sergeant Runge explained that he asked Deputy Frost to interview Defendant that day because the crime was one of violence and Deputy Frost was a more experienced interviewer. Nevertheless, Sergeant Runge stated that he was present during the entire interrogation and subsequent taped confession, except for when he left the interrogation room to get a kit to swab Defendant's mouth for DNA, and Deputy Frost never threatened Defendant. Furthermore, Sergeant Runge testified that at no time did Defendant complain about Deputy Frost threatening his life if he did not cooperate.

Sergeant Runge said that Defendant gave a very detailed description of the sexual acts performed on the victim and admitted that he may have "a problem." According to Sergeant Runge, Defendant corrected the officers if they misunderstood any of the details of the encounters between him and the victim. Defendant sobbed throughout the recorded confession. After the interview, Sergeant Runge charged Defendant with three additional counts of aggravated rape and sexual battery after he confessed to performing sexual acts on the victim on more occasions than what the victim had indicated. Sergeant Runge stated that as Defendant was leaving the station to be transported to the jail by Officer Cotten, Defendant asked to see him again. Defendant, who was still crying, then shook Sergeant Runge's hand and thanked him. On cross-examination, Sergeant Runge stated that neither he nor anyone else ever denied Defendant access to the restroom.

Finally, Sergeant Runge stated that he did not tell Defendant that he would call his mother then refuse to do so.

Defendant testified that at the time he was arrested he was living with his mother in Oakdale, having previously lived with the mother of the victim. He stated that he and the victim's mother had broken up about a week before he was arrested and he had moved out of her home. He stated that after the initial interview when he was first told of the allegations, he told the police that he would be going to Beaumont the next day to pick up a disability check. He testified that after Deputy Frost picked him up in Beaumont, he swore at Defendant and refused to fasten his seatbelt. According to Defendant, Deputy Frost drove well over seventy miles per hour and he ran off the road several times which scared him. Defendant claimed that he asked Deputy Frost to loosen the shackles on his legs and hands, but he refused, telling Defendant that the shackles were "fine." Defendant testified that Deputy Frost told him "that if it was his kid that he would kill me, you know. And he actually told me along the ride as well that he had my balls in his hands." Defendant stated that Deputy Frost said if he "didn't cooperate with him that he was gonna hammer me, you know, that he was going to end my life." Defendant explained that he believed Deputy Frost's threats because of his demeanor and because he was aware of his reputation around town. According to Defendant, he and Deputy Frost could hear each other well in the police car but Deputy Frost yelled because he was angry.

Defendant further testified that after he and Deputy Frost arrived at the Oakdale police station, he asked to go to the restroom, but no one would take him. He testified that he was alone with Deputy Frost during the interrogation and that the deputy continued to threaten him if he did not confess. He stated that Officer

Runge came into the room twice, once to give Deputy Frost some papers and then during the taped confession to swab him for DNA. When asked why he waited several months before complaining about Deputy Frost's intimidation, Defendant claimed that he told defense counsel about it at the 72 hour hearing and that he did not know the procedure regarding making such a complaint.

Deputy Frost, currently with the Rapides Parish Sheriff's Office, testified that at the time of the interrogation, he was working for the Oakdale Police Department. He stated that when the Beaumont police department contacted the Oakdale police that they had Defendant in custody in response to the arrest warrant, he volunteered to retrieve Defendant and return him to Oakdale. Deputy Frost stated that because Defendant was cuffed and shackled, he did not put the seat belt on him for the trip back for the reason that if there was an accident, it would be easier to get Defendant out of the vehicle. Deputy Frost stated that he barely spoke to Defendant the entire trip back, noting that there was a plexiglass shield between them and he would have had to yell to communicate with him. Deputy Frost explained that he was in a marked police vehicle, drove the speed limit, and did not swerve off the roadway. Deputy Frost stated that he never threatened Defendant in any way.

Deputy Frost admitted having been written up for rudeness several times, but he denied that he had ever actually threatened to harm anyone, including Defendant or an individual named Alfred Mayo, whom he had interviewed three times within one and a half months of interviewing Defendant. Deputy Frost explained that the complaints made against him by Defendant and Mr. Mayo were "almost verbatim" and were filed within one week of each other.

Officer Cotten testified that he was currently employed as a sergeant with the Coushatta Tribal Police Department, but that he was on officer with the Oakdale Police Department at all times relevant herein. Officer Cotten stated that he booked Defendant into the Oberlin jail after he was interrogated and arrested for the alleged aggravated rape and sexual battery offenses. Defendant never complained to him regarding Deputy Frost. Officer Cotten stated that Defendant was very apologetic after giving his recorded statement and that Defendant said that he was "sick" and needed help for doing what he did to the victim. According to Officer Cotten, as he was about to bring Defendant to the jail, he asked to speak with Sergeant Runge. He said Defendant shook the officer's hand and thanked him.

Defendant was the final witness to testify at the hearing on his motion to suppress. He stated that at the time he was arrested he was living with his mother in Oakdale, having previously lived with the victim's mother. About a week before he was arrested, he and the victim's mother broke up, and he moved out. He stated that after the initial interview when he was first told of the allegations, he told the police that he would be going to Beaumont the next day to pick up a disability check. He testified that after Deputy Frost picked him up in Beaumont, he swore at Defendant and refused to fasten his seatbelt. According to Defendant, Deputy Frost drove well over seventy miles per hour, and he ran off the road several times which scared him. Defendant claimed that he asked Deputy Frost to loosen the shackles on his legs and hands, but he refused, telling Defendant that the shackles were "fine." According to Defendant, Deputy Frost told him that if the victim were his kid, he would kill Defendant and that "he had [Defendant's] balls in his hands." Defendant stated that Deputy Frost said if he did not cooperate

8

"with him that he was gonna hammer me, you know, that he was going to end my life." Defendant explained that he believed Deputy Frost's threats because of his demeanor and because he was aware of his reputation around town. According to Defendant, he and Deputy Frost could hear each other well in the police car, but Deputy Frost yelled because he was angry.

Defendant further testified that after he and Deputy Frost arrived at the Oakdale police station, he asked to go to the restroom, but no one would take him. He testified that he was alone with Deputy Frost during the interrogation and that the deputy continued to threaten him if he did not confess. He stated that Sergeant Runge came into the room twice, once to give Deputy Frost some papers and then during the taped confession to swab him for DNA. When asked why he waited several months before complaining about Deputy Frost's intimidation, Defendant claimed that he told defense counsel about it at the seventy-two-hour hearing and that he did not know the procedure regarding making such a complaint.

The State submitted several documents into evidence at the motion to suppress hearing, including a letter Defendant wrote to the trial court dated March 1, 2013, and a notarized statement made by Defendant on March 22, 2013. In the March 1, 2013 letter, Defendant stated that his history would tell the court something about him and his character, explaining that he had never been in any serious trouble and that he had been a "very productive member out in society." Defendant wrote, "[I]n my past history, I've found trouble and trouble has found me and it seems that it has found me once again after all the yrs." With regard to his having been denied bail for being a flight risk, Defendant stated that the victim's mother had texted him and, knowing her family, he "feared for [his] life."

9

Defendant further expressed that he was "not a violent man but I'm not gonna allow anyone to hurt me either."

In the notarized statement, dated March 22, 2013, Defendant's first complaint regarding Deputy Frost was that he refused to buckle Defendant in a seatbelt and that he drove recklessly. According to Defendant, Deputy Frost ran off the road five or six times and that he asked Defendant if he could "swim with hand cuffs on?" Defendant accused Deputy Frost of telling him that he had his (Defendant's) "balls in his hands" and that he would "hammer" Defendant if he did not cooperate. Defendant claimed that once Deputy Frost started the tape recorder, he confessed to what was written on a paper for fear of his life because of Deputy Frost's reputation at home of being a dirty officer. Defendant also asserted that Deputy Frost would not loosen the cuffs and shackles when he complained of how tight they were. With regard to Sergeant Runge, Defendant complained in his March 23, 2013 statement that he made him wait to use the bathroom and that he promised to call Defendant's mother but never did so.

The trial court denied the motion to suppress Defendant's confession, finding that the officers' testimonies were credible but that Defendant's testimony was not credible. The trial court pointed to inconsistencies between his testimony at the hearing and the notarized statement. The trial court noted that Defendant did not allege that he was intimidated into confessing to crimes he did not commit until several months later, even after he was removed from the Oakdale Police Department and sent to Oberlin Police Department to be booked into jail. Furthermore, Defendant was advised of his rights, including the right to speak with counsel prior to making the confession, which he chose not to invoke at that time. The trial court further noted that while Deputy Frost had been written up for being

10

very rude to suspects, there were never any complaints of threats of actual harm, except for those made by Defendant and Mr. Mayo. As a result, the trial court determined that the totality of the circumstances indicated that Defendant's October 2, 2012 confession was freely, voluntarily, and knowingly made.

On appeal, Defendant contrasts his first interview with Sergeant Runge, where he calmly denied all wrongdoing, with his taped confession to Deputy Frost, where he was very emotional and confessed. According to Defendant, Deputy Frost's threats that he would be harmed if he did not cooperate, coupled with his knowledge of Deputy Frost's reputation as a dirty cop, amounted to duress thus making his confession involuntary and inadmissible. According to Defendant, his argument is bolstered by the fact that Deputy Frost only recorded Defendant's confession and not the entire interrogation. Further, Defendant claims that the fact that he took several months to disclose the intimidation should not weigh against him since he was unaware of the proper procedure to voice such complaints. In sum, he claims that the trial court erred in determining that he "was not intimidated, however slight." For those reasons, Defendant argues that this court should suppress his confession, vacate his conviction and sentence, and remand this matter to the trial court for further proceedings. The State counters that the record fully supports the trial court's denial of his motion to suppress.

In *State v. Poupart*, 11-710, p. 15 (La.App. 5 Cir. 2/28/12), 88 So.3d 1132, 1142, *writ denied*, 12-705 (La. 10/8/12), 98 So.3d 867, while discussing proper *Miranda* warnings, the fifth circuit noted that in *State v. Daniel*, 378 So.2d 1361, 1366 (La.1979), the supreme court stated, "Nothing in *Miranda* prevents an accused party from changing his mind and giving a statement after he has

11

previously declined to do so, so long as the statement is voluntary and intelligently made."

We conclude that the State met its burden of showing that Defendant's confession was intelligently and voluntarily made and that he failed to show he was threatened into making a false confession. There was no error in the trial court's denial of Defendant's motion to suppress the confession.

### *Other Crimes Evidence*

In his second assignment of error, Defendant asserts the trial court erred in allowing the State to present evidence that he had sexually assaulted two other minors. He submits that he was not charged with, arrested for, or convicted for any of the acts complained of by the two minors. Further, Defendant contends that the testimonies offered were inconsistent, contradictory, and so attenuated in time that the only purpose such evidence could serve was to unfairly prejudice him. The State counters that the evidence was admissible because it indicated that he had "a lustful disposition toward children." La.Code Evid. art. 412.2.

The State filed a notice of its intent to use evidence of other crimes on November 14, 2014. More particularly, the State sought to admit the testimony of Whitney Doyle and Alecia Wilkes who claimed that Defendant performed or attempted to perform sexual acts with them when they were minors and lived with Defendant and their mother Veronica Papilion, who were married at the time. The State contended that both the present matter and the previously alleged sexual conduct involved girls under the age of thirteen in their homes while Defendant was in relationships with their mothers, and this conduct established a pattern. After conducting a hearing on January 13 and 15, 2015, the trial judge granted the State's request to introduce other crimes evidence. Thereafter, Defendant filed an

application for writ of review. This court denied writs, stating "We find no error in the trial court's ruling allowing the State to introduce other crimes evidence." *State v. Deloach*, 15-159 (La.App. 3 Cir. 3/16/15) (unpublished opinion), *writ denied*, 15-753 (La. 8/28/15), 176 So.3d 402.

Louisiana law allows evidence of other acts involving sexually assaultive behavior or indicating a lustful disposition toward children to be admitted against an accused charged with a sex offense involving a victim under the age of seventeen. La.Code Evid. art. 412.2(A). However, the evidence is subject to the balancing test of La.Code Evid. art. 403, which allows a court to exclude relevant evidence when "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time." An appellate court reviews a trial court's ruling on the admissibility of evidence of similar crimes, wrongs, or acts in sex offense cases under the abuse of discretion standard. *State v. Bell*, 50,092, (La.App. 2 Cir. 9/30/15), 179 So. 3d 683.

In *State v. Carmouche*, 14-215, p. 3 (La.App. 3 Cir. 7/30/14), 145 So.3d 1101, 1104, *writ denied*, 14-1819 (La. 4/2/15), 176 So.3d 1031, this court held "a preponderance of the evidence standard applies" to determine whether the other crimes actually occurred. "Further, a single witness may establish preponderance of the evidence." *Id.*

> Any inculpatory evidence is "prejudicial" to a defendant, especially when it is "probative" to a high degree. *State v. Germain,* 433 So.2d 110, 118 (La.1983). As used in the balancing test, "prejudicial" limits the introduction of probative evidence of prior misconduct only when it is unduly and unfairly prejudicial. *Id. See also* Old Chief v. United States, 519 U.S. 172, 180, 117 S.Ct. 644, 650, 136 L.Ed.2d 574 (1997)("The term 'unfair prejudice,' as to a criminal defendant, speaks to the capacity of some concededly relevant evidence to lure

the factfinder into declaring guilt on a ground different from proof specific to the offense charged.").

*State v. Rose*, 06-402, p. 13 (La. 2/22/07), 949 So.2d 1236, 1244. In *Rose*, the supreme court held evidence of the defendant's prior conviction for the manslaughter of his previous wife, prior physical violence directed at her, and prior physical violence directed at the victim, his subsequent wife, established a "fixed and aberrant pattern of behavior[.]" *Id.* at 1246. The court determined any prejudicial effect of the other crimes evidence did not result in undue or unfair prejudice when balanced against its probative value and was, therefore, admissible.

In *State v. Broussard*, 13-415 (La.App. 3 Cir. 12/11/13), 128 So.3d 636, the defendant was convicted of attempted sexual battery for inappropriately touching an eleven-year-old girl. At trial, a witness testified she babysat in the defendant's home about ten years earlier. The defendant had once gotten into bed with her, attempted to kiss her, and put his hands up her shirt. He later sent the witness a card and a letter apologizing for his behavior. The trial judge found the defendant guilty but commented he probably would not have convicted the defendant absent that other crimes testimony. This court held the evidence was properly admitted and corroborated the victim's testimony. The evidence showed the defendant's interest in inappropriately touching young girls. The trial judge considered the evidence only to show the defendant's lustful disposition toward younger women.

Four victims testified at a pretrial hearing about the defendant's prior bad acts in *State v. Crawford*, 95-1352 (La.App. 3 Cir. 4/3/96), 672 So.2d 197, *writ denied*, 96-1126 (La. 10/4/96), 679 So.2d 1379. Their testimony was "neither vague nor indefinite," and the defendant's counsel was able to cross-examine each witness. *Id.* at 208. This court held the trial judge reasonably found the details of

14

the testimony convinced him of proof of the other crimes by a preponderance of the evidence. This court also considered the length of time between the prior acts and the crime and noted that factored only toward the weight of the evidence, not its admissibility.

In the instant matter, the trial court held that the evidence of sex offenses allegedly committed against young girls who were members of Defendant's household was relevant. He applied a preponderance of the evidence standard pursuant to *Carmouche*, 145 So.3d 1101. Although the trial court found "some prejudicial effect" to admitting the prior acts evidence here, he did not find the evidence to be unduly and unfairly prejudicial. Further, the trial court found that the State proved the other acts by a preponderance of the evidence.

At trial, the victims could not recall exactly what years the acts occurred. Nevertheless, Ms. Papilion and her daughters all testified to the same basic facts, that Defendant touched the girls inappropriately and either performed or attempted to perform sexual acts with them while they lived with him, and they were afraid to tell. Although the women testified the prior acts occurred a number of years earlier, that fact does not affect their admissibility. *Crawford*, 672 So.2d 197. Moreover, defense counsel was allowed to cross-examine the witnesses about all of the perceived inconsistencies, and the jury had the opportunity to form its own credibility and evidentiary weight determinations. The other crimes evidence was quite similar to the evidence the State presented regarding the charged crime and it served to show Defendant's lustful disposition toward young girls who lived in his household and were under his parental authority. Based on the foregoing, we conclude that the trial court did not abuse its discretion in admitting other crimes evidence.

## DECREE

Defendant's convictions and sentences are affirmed.

**AFFIRMED**.

This opinion is NOT DESIGNATED FOR PUBLICATION.
Uniform Rules—Courts of Appeal, Rule 2–16.3.